436 F.2d 809
 Maurice SHANNON et al., Appellants,
v.
UNITED STATES DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT, George Romney, Secretary of Department of Housing and Urban Development, Warren P. Phelan, Regional Administrator, Region II, Department of Housing and Urban Development, and Thomas J. Gallagher, Regional Administrator, Federal Housing Administration, Department of Housing and Urban Development.
 No. 18397.
 United States Court of Appeals, Third Circuit.
 Argued October 6, 1970.
 Decided December 30, 1970.
 
 COPYRIGHT MATERIAL OMITTED Edwin D. Wolf, Lawyers Comm. on Civil Rights, Philadelphia, Pa. (Michael Churchill, Robert B. Wolf, A. Stephens Clay, IV, Philadelphia, Pa., on the brief), for appellants.
 Michael C. Farrar, Atty., Dept. of Justice, Washington, D. C. (William D. Ruckelshaus, Asst. Atty. Gen., Louis C. Bechtle, U. S. Atty., Alan S. Rosenthal, Atty., Dept. of Justice, Washington, D. C., on the brief), for appellees.
 Before HASTIE, Chief Judge, and STALEY and GIBBONS, Circuit Judges.
 OPINION OF THE COURT
 GIBBONS, Circuit Judge.
 
 
 1
 Plaintiffs-Appellants in this action are white and black residents (some homeowners and some tenants), businessmen in, and representatives of private civic organizations in the East Poplar Urban Renewal Area of Philadelphia. They sue in their own right, and as class representatives of others similarly situated pursuant to Rules 23 and 17(b) of the Federal Rules of Civil Procedure. The individual defendants are those federal officials of the Department of Housing and Urban Development responsible for implementing the several federal statutes on fair housing and urban development. The Department of Housing and Urban Development (HUD) is also named as a defendant. Their complaint seeks a preliminary and a final injunction against the issuance of a contract of insurance or guaranty, and against the execution or performance of a contract for rent supplement payments, for Fairmount Manor, an apartment project which, when the complaint was filed, was about to be constructed in the East Poplar Urban Renewal Area. Jurisdiction is claimed under 28 U.S.C. § 1331 (federal questions), under 28 U.S.C. § 1361 (mandamus against federal officials), under 28 U.S. C. § 1343 (civil rights), and 28 U.S.C. § 2201 (declaratory judgments). A number of substantive and procedural irregularities are alleged in the steps leading to federal approval of the contract of insurance and the approval of the project for a rent supplement contract. The essential substantive complaint is that the location of this type of project on the site chosen will have the effect of increasing the already high concentration of low income black residents in the East Poplar Urban Renewal Area. The essential procedural complaint preserved on appeal is that in reviewing and approving this type of project for the site chosen, HUD had no procedures for consideration of and in fact did not consider its effect on racial concentration in that neighborhood or in the City of Philadelphia as a whole.
 
 
 2
 The district court denied plaintiffs' application for a preliminary injunction. It also denied defendants' Rule 12 motion to dismiss for failure to state a claim or for lack of jurisdiction. The defendants then filed an answer alleging lack of standing on the part of the plaintiffs, sovereign immunity, administrative discretion, and due compliance with all substantive and procedural requirements of the applicable law. An accelerated final hearing followed. On October 7, 1969 the district court filed an opinion containing findings of fact and conclusions of law and entered a final judgment dismissing the complaint.
 
 
 3
 We have been advised by the parties, although the facts do not fully appear in the record, that while the suit was pending construction of Fairmount Manor proceeded to completion and that the project is now occupied. We have also been advised that no mortgage insurance contract has been issued by HUD insuring a permanent mortgage on the project.
 
 
 4
 Fairmount Manor is designated a "221(d) (3)" project. This type housing project is authorized by Section 221(d) (3) of the Housing Act of 1954, 68 Stat. 590, 599, 12 U.S.C. § 1715l(d) (3). This mode of assistance, designed to assist private industry in providing for low and moderate income families, 12 U.S.C. § 1715l(a), provides that HUD may insure mortgages on housing owned by eligible sponsors for the entire replacement cost of the project. 12 U.S.C. § 1715l(d) (3) (iii). Sponsors eligible for such one hundred per cent mortgage insurance include private nonprofit corporations. Philadelphia Housing Development Corporation (PHDC) is an eligible nonprofit corporation which was formed for the express purpose of becoming a sponsor for Fairmount Manor. It made application to HUD for mortgage insurance under § 221(d) (3), 12 U.S.C. § 1715l(d) (3), which was approved on November 20, 1968. As is often the case with such nonprofit sponsors, there is a connection between the nonprofit sponsor and a commercial real estate developer, in this case Abram Singer & Sons (Singer).
 
 
 5
 Rent supplement contracts are authorized by § 101 of the Housing and Urban Development Act of 1965. 12 U.S. C. § 1701s. That statute authorizes HUD to contract with "housing owners" to make annual payments on behalf of "qualified tenants." "Qualified tenants" are individuals or families having incomes below the maximum permitted in the area for occupation of public housing dwellings, 12 U.S.C. § 1701s(c) (1), and who are occupying substandard housing, or have been displaced by condemnation or disaster, or are physically handicapped or aged. 12 U.S.C. § 1701s(c) (2). "Qualified tenants" are, in short, tenants who, but for the rent supplement contract pursuant to which the government pays part of their rent, would be living either in low rent public housing or in slum housing. "Housing owners," for purposes relevant to this case, are 221(d) (3) nonprofit sponsors.[1] Prior to its approval of Fairmount Manor for 221(d) (3) mortgage insurance, HUD approved PHDC as a "housing owner" and Fairmount Manor as a project eligible for 100 percent occupancy by "qualified tenants" receiving rent supplement assistance. Such approval did not require that PHDC rent only to "qualified tenants," but only that if it did so the government would pay a rent supplement for all such tenants. The record does not disclose what percentage of the tenants now occupying the project are "qualified tenants."
 
 
 6
 Fairmount Manor is located between 6th and 7th Streets and Fairmount Avenue and Green Street in North Philadelphia. It is within the East Poplar Urban Renewal Area, which is bounded, in turn, by 5th and 9th Streets and Spring Garden Street and Girard Avenue. East Poplar is the subject of an urban renewal plan. That plan was formulated by the Philadelphia Redevelopment Authority, which is a local public agency (LPA) within the meaning of the Housing Act of 1949. 42 U.S.C. § 1450 et seq. That statute authorizes HUD to advance loans and grants to local public agencies for urban renewal projects. The LPA first formulated an urban renewal plan for East Poplar on October 24, 1958. This plan was formally revised on five occasions, and the presently effective plan is the Fifth Amended Plan for East Poplar, dated June, 1964. Federal funds were made available for site acquisition and other purposes in connection with the East Poplar urban renewal plan pursuant to a Loan and Grant Contract between HUD and the LPA.
 
 
 7
 Under § 101(c) of the Housing Act of 1949 no contract may be entered into by HUD for federal financial assistance, and no mortgage may be insured, unless there is presented to the Secretary
 
 
 8
 * * * by the locality a workable program for community improvement (which shall include an official plan of action, as it exists from time to time, for effectively dealing with the problem of urban slums and blight within the community and for the establishment and preservation of a well-planned community with well-organized residential neighborhoods of decent homes and suitable living environment for adequate family life) for utilizing appropriate private and public resources to eliminate, and prevent the development or spread of, slums and urban blight * * *. 42 U.S.C. § 1451(c).
 
 
 9
 Section 105(d) of the Housing Act of 1949, 42 U.S.C. § 1455(d), provides,
 
 
 10
 No land for any project to be assisted under this subchapter shall be acquired by the local public agency except after public hearing following notice of the date, time, place, and purpose of such hearing.
 
 
 11
 The legislative history of § 105(d) indicates that it was intended to give the public in an affected area an opportunity to be heard with respect to an urban renewal plan before the LPA entered into a contract for federal financial aid.[2] HUD has no published regulations in the Code of Federal Regulations respecting the time or manner of conducting a § 105(d) public hearing, nor has it published such regulations respecting the manner in which a LPA will satisfy HUD that it has a workable program for community improvement. Instead, the agency has published for internal departmental use an Urban Renewal Handbook. That Handbook recognizes that a modification of an urban renewal plan may be of such magnitude as to require a new § 105(d) hearing. Urban Renewal Handbook, RHA 7206.1, ch. 3. The Handbook also specifies what submissions must be made by a LPA to satisfy HUD respecting compliance with the workable program for community improvement under § 101(c). Among the submissions required is one designated R-215:
 
 
 12
 Report on Minority Group Considerations, if project will result in substantial net reduction in supply of housing in project areas available to racial minority families.
 
 
 13
 The last time a § 105(d) hearing was held on a revision of the East Poplar plan was prior to the Fifth Amendment, which was prepared by the LPA in June of 1964 and submitted to the Urban Renewal Administration[3] in October, 1965. That submission contained a form R 215 which stated:
 
 
 14
 The proposed redevelopment of this section of the East Poplar Urban Renewal Area is for residential and commercial purposes and will not result in a substantial reduction in housing for minority group families.
 
 
 15
 The original urban renewal plan, adopted in 1959, called for a combination of rehabilitation of structures by property owners in part of the area, and of site acquisition in another part. Within the tract to be acquired existing structures deemed non-salvageable were to be cleared, and salvageable structures were to be conveyed to a redeveloper for rehabilitation as single family and multifamily owner occupied dwellings. In addition the redeveloper was to erect 244 single family owner occupied units. The changes approved in Amendments One through Five left these features of the Plan essentially unchanged.
 
 
 16
 Plaintiffs claim that in reliance on the original Plan and subsequent amendments, which contemplated redevelopment of the Fairmount Manor area primarily for single family owner-occupied homes, they made substantial investments, commitments, and in some cases home purchases. Rehabilitation of some 70 structures originally deemed salvageable did not proceed on schedule and these were eventually vandalized. In 1966 these were, with HUD approval (granted without a § 105(d) Hearing), demolished. Of the 244 new single family dwellings only 70 have been erected to date.
 
 
 17
 Thus in 1966 the vision if not the letter of the Fifth Amended Plan seemed largely frustrated in this area of East Poplar. Singer, because of financial contingencies in his contract with the LPA, was not technically in default on those contracts. Singer proposed a 221 (d) (3) project with federal rent supplements, to be built by him for a nonprofit sponsor. The LPA entered into a revised contract with Singer for such a project on September 26, 1967. This contract referred to a 221(d) (3) project for families of moderate income, but it is undisputed that at all times after the project was first discussed a 221(d) (3) project with rent supplements was contemplated. Prior to the execution of the September 26, 1967 contract between Singer and the LPA, the proposed change in the Plan was submitted in some form to the HUD Assistant Regional Administrator for Renewal Assistance, who on June 30, 1967 informed the LPA that the maximum housing density permitted by the urban renewal plan would have to be reduced as a prerequisite to HUD approval (Exhibit P-61). A new submission with lower housing density was submitted. On November 3, 1967 the HUD Assistant Regional Administrator advised the Regional Administrator as follows:
 
 
 18
 We have reviewed the subject application in accordance with the provisions of Sections 2-2-3 and 2-2-4 of Volume VII, Field Service Manual, and find that the Alternate Procedure No. 2, Approval of Proposed Revision and Local Approvals by the Regional Administrator is appropriate.
 
 
 Findings
 
 
 19
 1. No aspect of the proposed change makes necessary or desirable referral to the Deputy Assistant Secretary for Renewal Assistance.
 
 
 20
 2. This amendment merely reduces the maximum dwelling unit density from 59 per acre to 32 in a one block area of the project consistent with FHA approval.
 
 
 21
 3. Since this revision is of a minor nature and represents no substantial departure from the Ordinance adopted approving the previous Urban Renewal Plan, no formal approval by City Council is necessary.
 
 
 Recommendation
 
 
 22
 Your approval of the proposed revision to the Urban Renewal Plan is recommended. If you concur in the above findings, an appropriate letter to the LPA is attached for your signature. (Exhibit P-61)
 
 
 23
 The same day the HUD Regional Administrator approved the proposed revision in the Plan (Exhibit P-61). There was no final approval for rent supplements, however, until September of 1968.
 
 
 24
 The November 3, 1967 approval of a revision in the Plan was made without any § 105(d) hearing and without any submission of an R-215 Report on Minority Considerations. It was made pursuant to what local HUD officials describe as a "red line" procedure. The Urban Renewal Handbook states,
 
 
 25
 A proposed change in the project may require a new public hearing under the provisions of State or local law or the Contract for Loan and Grant. The LPA shall consult the Regional Office concerning the necessity for a new hearing. (RHA 7206.1, ch. 3)
 
 
 26
 HUD does not require a public hearing with respect to every change in a Plan. A memorandum from HUD Assistant Regional Administrator dated December 29, 1966 formalizes a procedure for approving minor changes in a Plan in an informal manner. That memorandum provides in part:
 
 
 27
 Since all red pencil changes are changes to the renewal plan, they must be reviewed by the Planning Branch. Here is where the Regional Office determines:
 
 
 28
 (1) Whether the change constitutes a material alteration in a basic element of the Plan; and
 
 
 29
 (2) Whether or not the change is acceptable to us from a planning viewpoint. (Exhibit P-68, p. 2)
 
 
 30
 The change in the Plan from that set forth in the Fifth Amended Plan required a change in zoning. In March of 1968 the City of Philadelphia held a public hearing on the zoning change and in May, 1968 passed an ordinance approving it. This zoning amendment hearing was not, however, a public hearing pursuant to § 105(d), since HUD had long since determined to approve the change in the Plan under the "red line" procedure. Neither in November, 1967 when the revision to the plan was approved, nor in September, 1968 when federal officials gave final approval to the previously requested 221(d) (3) mortgage insurance and to rent supplement assistance, did HUD require any new § 105(d) hearing or any new submission of a Report on Minority Group Considerations. Plaintiffs claim these actions were invalid.
 
 
 31
 In addition to the Housing Act of 1949, plaintiffs rely on two other statutes. These are Title VI of the Civil Rights Act of 1964, Pub.L. 88-352, Title VI, July 2, 1964, 78 Stat. 252, 42 U.S.C. § 2000d et seq., and Title VIII of the Civil Rights Act of 1968, Pub.L. 90-284, Title VIII, Apr. 11, 1968, 82 Stat. 81, 42 U.S.C. § 3601 et seq. The 1964 Act provides in part:
 
 
 32
 No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. (42 U.S.C. § 2000d).
 
 
 33
 Each Federal department which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with the achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken. * * * (42 U.S. C. § 2000d-1).
 
 The 1968 Act provides in part:
 
 34
 It is the policy of the United States to provide, within constitutional limitations, for fair housing throughout the United States. (42 U.S.C. § 3601).
 
 
 35
 (d) The Secretary of Housing and Urban development shall
 
 
 36
 * * * * * *
 
 
 37
 (5) Administer the programs and activities relating to housing and urban development in a manner affirmatively to further the policies of this subchapter. (42 U.S.C. § 3608(d) (5)).
 
 
 38
 The 1968 Civil Rights Act in other sections prohibits a number of discriminatory practices in the sale, rental, financing or brokerage of housing, and provides, with respect to such practices, an enforcement machinery. 42 U.S.C. § 3610. The section quoted above, however, refers to the Secretary's duties with respect to HUD's own programs and activities.
 
 
 39
 Read together, the Housing Act of 1949 and the Civil Rights Acts of 1964 and 1968 show a progression in the thinking of Congress as to what factors significantly contributed to urban blight and what steps must be taken to reverse the trend or to prevent the recurrence of such blight. In 1949 the Secretary, in examining whether a plan presented by a LPA included a workable program for community improvement, could not act unconstitutionally, but possibly could act neutrally on the issue of racial segregation. By 1964 he was directed, when considering whether a program of community development was workable, to look at the effects of local planning action and to prevent discrimination in housing resulting from such action. In 1968 he was directed to act affirmatively to achieve fair housing. Whatever were the most significant features of a workable program for community improvement in 1949, by 1964 such a program had to be nondiscriminatory in its effects, and by 1968 the Secretary had to affirmatively promote fair housing.
 
 
 40
 The interrelationship of the Housing Act of 1949 and the 1964 Civil Rights Act is recognized in the regulations issued by HUD. 24 C.F.R. §§ 1.1-1.7. Those regulations do not apply to insurance or guaranty contracts, 24 C.F.R. § 1.3,[4] but they do apply to urban renewal programs under the Housing Act of 1949, and to "any assistance to any person who is the ultimate beneficiary under such program or activity." 24 C.F.R. § 1.3 (3). Such persons include rent supplement beneficiaries. The regulations provide:
 
 
 41
 A recipient,[5] in determining the location or types of housing, * * * financial aid or other benefits which will be provided under any such program or activity, or the class of persons to whom, or the situations in which, such housing, * * * financial aid, or other benefits will be provided * * * or the class of persons to be afforded an opportunity to participate in any such program or activity, may not, directly or through contractual or other arrangements, utilize criteria or methods of administration which have the effect of subjecting persons to discrimination because of their race * * * or have the effect of defeating or substantially impairing the objectives of the program or activity as respect persons of a particular race, color or national origin. (24 C.F.R. § 1.4(b) (2) (i)) (emphasis added).
 
 
 42
 This regulation, issued on the authority of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1, was in effect when "red line" approval for a change to a 221(d) (3) project was given in 1967 and when final approval of mortgage insurance and rent supplement assistance was given in 1968. The regulation marks a recognition by the agency charged with enforcement that the 1964 Act must be read in pari materia with the other statutes dealing with housing and urban development. In particular in adopting an "effects" test rather than an "intention" test for reviewing local actions respecting location of types of housing, the regulation recognizes that the 1964 Act gave refined meaning to the requirement in the Housing Act of 1949 of a "workable program for community improvement." 42 U.S.C. § 1451(c). While no regulations have been issued under that part of the Civil Rights Act of 1968 applicable to the administration of HUD's own programs, 42 U.S.C. § 3608(d) (5), that statute, too, must be read as a refinement of the "workable program for community improvement" requirement.
 
 
 43
 The issue then, is whether, when HUD approved a change from an urban renewal plan which contemplated substantial owner occupied dwellings to a plan which contemplated 221(d) (3) dwellings with rent supplement assistance, the procedures which it followed were in adequate compliance with the 1949 Housing Act and the 1964 and 1968 Civil Rights Acts.
 
 
 44
 The defendants challenge the standing of these plaintiffs to raise that issue. The district court held that they had the requisite standing. We agree.
 
 
 45
 The question of standing to challenge agency actions in the administration of the Federal Housing Act has arisen heretofore in the context of an agency's duty to require adequate relocation housing for minority group residents removed by virtue of site acquisition. Norwalk CORE v. Norwalk Redevelopment Agency, 395 F.2d 920 (2d Cir. 1968); Powelton Civic Home Owners Ass'n v. HUD, 284 F.Supp. 809 (E.D.Pa.1968); Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 441 (N.D.Cal. 1968). Those cases recognized the standing to sue of members of the potentially displaced community. By virtue of the specific statutory provisions prohibiting grants or loans to a LPA in the absence of an adequate relocation program, 42 U.S.C. § 1455(c), such persons are clearly within the zone of interests to be protected by the statute, cf. Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and thus their standing is somewhat clearer than that of the instant plaintiffs. It has also been held that potential residents of federally assisted housing projects have standing to challenge agency decisions as to the site of those projects. Hicks v. Weaver, 302 F.Supp. 619 (E.D.La.1969); Gautreaux v. Chicago Housing Authority, 265 F. Supp. 582 (N.D.Ill.1967). In these cases, too, the potential residents, claiming discriminatory site selection, were within the zone of interests protected by the statute. In North City Area-Wide Council, Inc. v. Romney, 428 F.2d 754 (3d Cir. 1970), this court found that a citizen's group had standing to seek review of a change in citizen participation in the Model Cities Program. There, too, it was rather clear that the protesting plaintiffs were within the zone of interests protected by the Model Cities statute, 42 U.S.C. § 3301 et seq. The defendants point out that the instant plaintiffs are neither displaced residents nor potential occupants and that the HUD action which they challenge was not taken under the Model Cities statute. Such persons, they say, have too remote an interest to confer standing on them to challenge these administrative actions. We do not agree. Certainly the dispute which they seek to have adjudicated will be presented in an adversary context. Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968). The test, for Article III purposes, is whether or not plaintiffs allege injury in fact. They do indeed. They allege that the concentration of lower income black residents in a 221(d) (3) rent supplement project in their neighborhood will adversely affect not only their investments in homes and businesses, but even the very quality of their daily lives. They claim, moreover, that they have been aggrieved by agency action within the meaning of § 10(a) of the Administrative Procedure Act. 5 U.S.C. § 702. Classes of persons deemed by the courts to be sufficiently aggrieved by agency action for standing to sue are expanding. Association of Data Processing Service Organizations, Inc. v. Camp, supra; Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970); Scenic Hudson Preservation Conf. v. FPC, 354 F.2d 608, 616 (2d Cir. 1965); Office of Communication of United Church of Christ v. FPC, 123 U.S.App. D.C. 328, 359 F.2d 994, 1000 (1966). The plaintiffs here, perhaps more than the displaced and relocated former residents or the potential occupants of new housing, are vitally affected by the adequacy of the particular program of community improvement for the preservation of a residential community with decent homes and a suitable living environment which they seek to challenge. 42 U.S.C. § 1451 (c).
 
 
 46
 But, say the defendants, even assuming standing in the Article III sense and in the sense of 5 U.S.C. § 702, this is a case of agency action committed to agency discretion by law. Neither in the Housing Act of 1949, 42 U.S.C. § 1450 et seq., nor in the relevant provisions of the Housing Act of 1954, 12 U.S.C. § 1715l, and the Housing and Urban Development Act of 1965, 12 U.S.C. § 1701s, do we find language which expressly or by necessary implication would make unreviewable HUD's decision to permit modification of the East Poplar Urban Renewal Plan by substituting a different type of housing than was contemplated in earlier versions of the Plan. Congressional intent to commit agency action to unreviewable discretion must appear from "clear and convincing evidence." Abbott Laboratories v. Gardner, 387 U.S. 136, 141, 87 S.Ct. 1507, 18 L.Ed. 2d 681 (1967). There is no such evidence in the statutes under which HUD acted in this case. The District Court concluded that some HUD decisions under the Housing Act of 1949 are reviewable. It said:
 
 
 47
 We think it clear that we are empowered to review the agency's adherence to its own procedural requirements. Thorpe v. Housing Authority of Durham, 393 U.S. 268, 89 S.Ct. 518, 21 L.Ed.2d 474 (1969), particularly where, as here, the statutory requirement for a hearing from which HUD's red line standards are drawn, 42 U.S. C.A. § 1455(d), is itself a mandatory requirement in every loan and grant contract, 42 U.S.C.A. § 1455, see Western Addition Community Organization v. Weaver, 294 F.Supp. 433, 442 (N.D. Cal.1968). Therefore, while we think it appropriate that HUD be given some discretion to implement the red line procedure, it seems clear that such discretion could not be beyond the reach of judicial review contemplated in the Administrative Procedure Act, 5 U.S.C.A. § 706 * * *. (305 F. Supp. at 214).
 
 
 48
 The district court then drew a distinction between the decision whether the proposed change qualified for "red line" treatment, and the decision whether a given "red line" change was acceptable from a planning viewpoint. The former decision, involving a determination that a proposed change was not a material alteration of the plan, was said to be reviewable. The latter, involving planning judgments, was said to be unreviewable. The district court then addressed itself to a determination of the basic elements of the Fifth Amendment to the East Poplar Urban Renewal Plan.
 
 
 49
 HUD contended that land use controls are the determinative factors, and that the introduction of Fairmount Manor was not such a basic change in the land uses proposed. It defended its decision to grant "red line" approval for the project chiefly on the relatively minor changes which were required in the applicable zoning ordinances. Plaintiffs contend that a much more sophisticated judgment must be made and many factors besides land use must be taken into consideration in deciding if an urban renewal plan encompasses or is part of a workable program for community improvement. They contend that an essential part of the East Poplar plan was that resident home ownership would tend to create a more stable and racially balanced environment. They contend that the change to 221(d) (3) rent supplement housing introduced into a neighborhood in which there were already a large number of public low rent housing projects another project for the same socio-economic group.
 
 
 50
 The district court found that some degree of sales housing was an element of the Plan. It held, however, that approval of the change to 221(d) (3) rent supplement housing was one which HUD could, in its discretion, make as a "red line" change. The significance of this holding was that it approved a HUD procedure which eliminated the necessity for both a § 105(d) public hearing and a Report on Minority Group Considerations. It approved a procedure, in other words, which foreclosed any inquiry into the effect of the change in type of housing on racial concentration in the East Poplar area or in Philadelphia as a whole. By permitting HUD to concentrate on land use considerations it permitted that agency to disregard the fact that from a social standpoint a 221(d) (3) project with 100 percent rent supplement occupancy is the functional equivalent of a low rent public housing project.
 
 
 51
 The defendants assert that HUD has broad discretion to choose between alternative methods of achieving the national housing objectives set forth in the several applicable statutes. They argue that this broad discretion permitted HUD in this case to make an unreviewable choice between alternative types of housing. We agree that broad discretion may be exercised. But that discretion must be exercised within the framework of the national policy against discrimination in federally assisted housing, 42 U.S.C. § 2000d, and in favor of fair housing. 42 U.S.C. § 3601. When an administrative decision is made without consideration of relevant factors it must be set aside. Scenic Hudson Preservation Conf. v. FPC, supra, 354 F.2d at 612. Here the agency concentrated on land use factors and made no investigation or determination of the social factors involved in the choice of type of housing which it approved. Whether such exclusive concentration on land use factors was originally permitted under the Housing Act of 1949, since 1964 such limited consideration has been prohibited.
 
 
 52
 Oddly enough, HUD in its Low Rent Housing Manual recognizes that concentration of low rent public housing can have adverse social, and hence planning, consequences. Paragraph 4(g) of that manual provides:
 
 
 53
 [a]ny proposal to locate housing only in areas of racial concentration will be prima facie unacceptable and will be returned to the Local Authority for further consideration.
 
 
 54
 If there is a distinction between the effects of site selection of low rent public housing and of 221(d) (3) rent supplement housing, such distinction has not been developed in the record before us. No similar regulations applicable to 221 (d) (3) projects or to the rent supplement program have been issued, though these programs, operating in conjunction, would seem to have the same potential for perpetuating racial segregation as the low rent public housing program has had. See Gautreaux v. Chicago Housing Authority, 296 F.Supp. 907 (N.D.Ill. 1969); Hicks v. Weaver, supra.
 
 
 55
 Defendants contend that the interests which plaintiffs seek to vindicate are adequately protected by the complaint and enforcement procedures of Title VIII of the Civil Rights Act of 1968, 42 U.S.C. §§ 3610-3613, and Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d-1. They contend plaintiffs could have and did not exhaust enforcement remedies therein provided. We do not agree. Those sections of the 1968 Act establish a complaint and enforcement procedure for the redress of discriminatory housing practices prohibited by §§ 804, 805 and 806 of the Act, 42 U.S.C. §§ 3604, 3605, 3606. The complaint and enforcement procedures do not pertain to the Secretary's affirmative duties under § 808(d) (5) of the 1968 Act, 42 U.S.C. § 3608(d) (5), or under the 1964 Civil Rights Act, or under the Housing Act of 1949. As to these affirmative duties judicial review of his actions is available as outlined hereinabove. Similarly, the procedures afforded under the Civil Rights Act of 1964 are designed to provide redress against specific discriminatory acts, and do not pertain to the adequacy of HUD procedures.
 
 
 56
 Finally, defendants contend that there was no evidence in the record below of discriminatory site selection in the location of rent supplement projects. The district court found:
 
 
 57
 What proof there is on this question shows without dispute that rent subsidy housing is evenly and well disbursed within the city as well as without, in both ghetto and non-ghetto areas. (305 F.Supp. at 225).
 
 
 58
 Leaving to one side the plaintiffs' contention that this finding goes beyond the proof and is in any event the result of the district court's circumscription of evidence on that point, we think the finding is irrelevant. Congress has since 1949 refined its view of the factors relevant to achieving national housing objectives. At least under the 1968 Civil Rights Act, and probably under the 1964 Civil Rights Act as well, more is required of HUD than a determination that some rent supplement housing is located outside ghetto areas. Even though previously located rent supplement projects were located in non-ghetto areas the choice of location of a given project could have the "effect of subjecting persons to discrimination because of their race * * * or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity as respect persons of a particular race. * * *" 24 C.F.R. § 1.4(b) (2) (i). That effect could arise by virtue of the undue concentration of persons of a given race, or socio-economic group, in a given neighborhood. That effect could be felt not only by occupants of rent supplement housing and low cost housing, but by occupants of owner occupied dwellings, merchants, and institutions in the neighborhood. Possibly before 1964 the administrators of the federal housing programs could, by concentrating on land use controls, building code enforcement, and physical conditions of buildings, remain blind to the very real effect that racial concentration has had in the development of urban blight. Today such color blindness is impermissible. Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy. Approval of Fairmount Manor under the "red line" procedure produced a decision which failed to consider that policy.
 
 
 59
 The only institutionalized methods which have been called to our attention by which HUD can obtain the information necessary to make an informed decision on the effects of site selection or type selection of housing on racial concentration are the public hearings specified by § 105(d) of the 1949 Act and the Report on Minority Group Considerations (R-215) required by the Urban Renewal Handbook as a part of a Project application. A public hearing at the local level would be an obvious means for obtaining the relevant information. We do not now hold that such a public hearing is the only acceptable means. A requirement for a report from the applicant, such as the Report on Minority Group Considerations (R-215), may be an acceptable alternative. The Agency, with its own expertise, may find an alternative preferable to either. We hold, however, that the Agency must utilize some institutionalized method whereby, in considering site selection or type selection, it has before it the relevant racial and socio-economic information necessary for compliance with its duties under the 1964 and 1968 Civil Rights Acts.
 
 
 60
 Plaintiffs urge that some sort of adversary hearing or at least an opportunity for residents in the area to be heard should be required. They rely on the district court decision in Powelton Civic Home Owners Ass'n v. HUD, supra. Without suggesting how this court would rule on the Powelton situation, we think a case involving the adequacy of relocation procedures which are dealt with specifically in the Housing Act of 1949, 42 U.S.C. § 1455(c), is distinguishable from the more general problem of racial concentration presented here. In this case the judgment to be made by HUD is quasi-legislative. So long as it adopts some adequate institutional means for marshaling the appropriate legislative facts the rights of affected residents will be adequately protected, we think, by the opportunity to obtain judicial review pursuant to the Administrative Procedure Act after the agency decision. For deliberately discriminatory action by a LPA there are other adversary type remedies available. 42 U.S.C. § 3610 et seq.; 42 U.S.C. § 2000d-1; 24 C.F.R. § 1.7(b).
 
 
 61
 The Report on Minority Group Considerations (R-215) as specified in the Urban Renewal Manual which was in effect at the time of the agency action here challenged is not in our judgment adequate to the purpose.[6] It is apparently required only if the project will result in a substantial net reduction in supply of housing in the project area available to racial minority families. That is obviously a consideration, but it is not enough. The effect of a substantial net increase in racial minority families in the area as a result of the project is an equally obvious consideration. Without in any way attempting to limit the agency in the exercise of its own administrative expertise, we suggest that some considerations relevant to a proper determination by HUD include the following:
 
 
 62
 1. What procedures were used by the LPA in considering the effects on racial concentration when it made a choice of site or of type of housing?[7]
 
 
 63
 2. What tenant selection methods will be employed with respect to the proposed project?
 
 
 64
 3. How has the LPA or the local governing body historically reacted to proposals for low income housing outside areas of racial concentration?
 
 
 65
 4. Where is low income housing, both public and publicly assisted, now located in the geographic area of the LPA?
 
 
 66
 5. Where is middle income and luxury housing, in particular middle income and luxury housing with federal mortgage insurance guarantees, located in the geographic area of the LPA?
 
 
 67
 6. Are some low income housing projects in the geographic area of the LPA occupied primarily by tenants of one race, and if so, where are they located?
 
 
 68
 7. What is the projected racial composition of tenants of the proposed project?
 
 
 69
 8. Will the project house school age children and if so what schools will they attend and what is the racial balance in those schools?
 
 
 70
 9. Have the zoning and other land use regulations of the local governing body in the geographic area of the LPA had the effect of confining low income housing to certain areas, and if so how has this effected racial concentration?
 
 
 71
 10. Are there alternative available sites?
 
 
 72
 11. At the site selected by the LPA how severe is the need for restoration, and are other alternative means of restoration available which would have preferable effects on racial concentration in that area?
 
 
 73
 The foregoing considerations are confined to the geographic area served by the LPA. We do not suggest that by so confining our listing we would restrict HUD to a review of factors operating only within such geographic area. The time may come when, in order to achieve the goals of the national housing policy, HUD will have to take steps to overcome the effects of contrasts in urban and suburban land use regulations. What those steps should be we do not here suggest.
 
 
 74
 Nor are we suggesting that desegregation of housing is the only goal of the national housing policy. There will be instances where a pressing case may be made for the rebuilding of a racial ghetto. We hold only that the agency's judgment must be an informed one; one which weighs the alternatives and finds that the need for physical rehabilitation or additional minority housing at the site in question clearly outweighs the disadvantage of increasing or perpetuating racial concentration.
 
 
 75
 Thus the district court judgment dismissing the complaint must be reversed. This brings us to a consideration of possible remedies. The defendants suggest that because the project has been completed and occupied by rent supplement tenants there is no longer any relief which may feasibly be given. The completion of the project and the creation of intervening rights of third parties does indeed present a serious problem of equitable remedies. It does not, however, make the case moot in the Article III sense. Relief can be given in some form. For example, the court could order that the project mortgage not be guaranteed under § 221(d) (3) and that it be sold to a private profit-making owner. It could order that the project continue in non-profit ownership as a 221(d) (3) project, but that the rent supplement tenants be gradually phased out and replaced with market rental tenants. Since the disposition which we propose to make will require a remand to the district court and then to the administrative agency, it may well be that no equitable relief at all will in the end be required. This suit for an injunction and for declaratory relief will have been no less appropriate a means for obtaining judicial review even if that should prove to be the case.
 
 
 76
 The final order of the district court will be vacated and the cause remanded to the district court for the entry of an injunctive order prohibiting further steps in the finalization of mortgage insurance or other federal financial assistance to the project until such time as HUD makes a determination in substantive and procedural conformance with this opinion as to whether the location of a 221(d) (3) project with 100 percent rent supplement occupancy will enhance or impede a workable program for community improvement in conformity with the Civil Rights Acts of 1964 and 1968. That order should impose an appropriate time limit for such determination. Because of the intervening rights of tenants and others not before the court the order need not in the interim require termination of rent supplement payments. The HUD determination shall be reviewable by the district court which at that time may make an appropriate final order.
 
 
 
 Notes:
 
 
 [1]
 12 U.S.C. § 1701s(b). As further provided in this section such term also includes a private nonprofit corporation or other private nonprofit legal entity, a limited dividend corporation or other limited dividend legal entity, or a cooperative housing corporation, which is the owner of a rental or cooperative housing project financed under a State or local program providing assistance through loans, loan insurance, or tax abatement and which prior to completion or construction or rehabilitation is approved for receiving the benefits of this section. Subject to the limitations provided in subsection (h) of this section, the term "housing owner" also has the meaning prescribed in such subsection
 
 
 [2]
 See 95 Cong. Rec. 4864 (1949) (remarks of Sen. Cain). This amendment to the bill was proposed from the floor by Senator Cain
 
 
 [3]
 The Urban Renewal Administration was an agency within the Housing and Home Finance Agency (HHFA). That organizational structure was abolished, and the functions of the HHFA transferred to the Secretary of the Department of Housing and Urban Development in 1965. Pub.L. 89-174, Sept. 9, 1965, 79 Stat. 669, 42 U.S.C. § 3534
 
 
 [4]
 Although authority to issue mortgage insurance is unaffected by the Civil Rights Act of 1964, 42 U.S.C. § 2000d-4, that exception has no bearing on the outcome of this case. The federal assistance involved here is a combination of rent supplements and mortgage insurance. The rent supplement program comes within the terms of 42 U.S.C. § 2000d, and is not excepted by 42 U.S.C. § 2000d-4. Thus in passing on this revision in the urban renewal plan, HUD was not entitled to overlook the prohibitions of the 1964 Civil Rights Act. Moreover, in the duties imposed on the Secretary by the Civil Rights Act of 1968, there is no distinction between mortgage insurance and other programs relating to housing and urban development. 42 U.S.C. § 3608(d) (5)
 
 
 [5]
 A "recipient" is not to be confused with an "ultimate beneficiary." Recipients include all political subdivisions, public agencies, organizations, institutions, or individuals
 to whom Federal financial assistance is extended, directly or through another recipient, for any program or activity, or who otherwise participates in carrying out such program or activity * * (24 C.F.R. § 1.2(f)).
 The LPA, whose actions are the focus of this case, is a recipient within this definition.
 
 
 [6]
 The requirements for the Report on Minority Group Considerations now specified in the Urban Renewal Manual are far more extensive, requiring a statement on the expected effect on racial concentration. RHA 7207.1, ch. 5, § 2
 
 
 [7]
 Cf., El Cortez Heights Residents and Property Owners Ass'n v. Tucson Housing Auth., 10 Ariz.App. 132, 457 P.2d 294 (1969)