**SOUTH EAST CHICAGO COMMISSION,**
a voluntary community organization,
et al., Plaintiffs,

v.

**DEPARTMENT OF HOUSING AND
URBAN DEVELOPMENT et al.,**
Defendants.

**No. 71 C 1967.**

United States District Court,
N. D. Illinois, E. D.

May 24, 1972.

Kirkland & Ellis, Davis & Miner, Earl Neal, Chicago, Ill., for plaintiffs.

Holleb, Gerstein, Glass & Glicken, Chicago, Ill., for Lake Village, Draper & Kramer, American National Bank.

Jerome H. Torshen, Ltd., Richard L. Curry, Chicago, Ill., for City of Chicago.

## MEMORANDUM OPINION AND ORDER

McLAREN, District Judge.

This suit challenges federal subsidies of a housing project in the Hyde Park-Kenwood neighborhood of Chicago as fostering racial concentration. The principal plaintiff is the South East Chicago Commission (SECC), a voluntary citizens' organization in Hyde Park-Kenwood. Defendants include both federal and City of Chicago housing agencies and officials, and the developers, managers and financiers of this housing project. The principal non-government defendant is Lake Village Associates (LVA), the developers of the contested housing project.

Defendants have moved to dismiss the complaint for failure to state a claim upon which relief can be granted, and both sides have moved for summary judgment on Counts I, II and IV of the complaint; the federal defendants have moved to dismiss the other count, Count III; and plaintiffs have moved for a preliminary injunction. The Court finds for the defendants on Counts I, II and IV, and those counts will be dismissed; however, the federal defendants' motion to dismiss Count III and plaintiffs' motion for preliminary injunction are denied. The following incorporates the Court's findings of fact and conclusions of law.

## FACTUAL BACKGROUND

The building in question is presently under construction on parcel HR1B (high density residential) in the Hyde Park-Kenwood Urban Renewal Area located on the south side of Chicago. The history of the project is as follows. On November 14, 1966 the City of Chicago's Department of Urban Renewal (DUR) offered HR1B and neighboring parcels for sale for redevelopment. Both LVA and United Dwelling Foundation of Metropolitan Chicago-Amalgamated Social Benefits Association (UDF-Amalgamated) made proposals. LVA's was for mainly upper-income units.

Although both proposals met the DUR requirement of at least 20 per cent moderate income level units, the DUR staff criticized the economic homogeneity of the developments proposed. On June 20, 1967 at a public meeting of the DUR board, LVA and UDF-Amalgamated entered into a memorandum of agreement to divide the parcels with LVA to develop HR1B. The DUR board approved the agreement, which provided for a minimum of 20 per cent moderate income housing.

In January 1969, LVA proposed to DUR that due to the influx of new luxury units in Hyde Park-Kenwood, moderate income housing might be more appropriate for HR1B. On July 22, 1969, after reviewing this proposal, DUR approved LVA's preliminary proposal for moderate income housing on the site and authorized LVA to apply for Section 236 financing under the National Housing Act of 1937, as amended, 42 U.S.C. § 1401 et seq.

LVA's final plans for HR1B were submitted to DUR, the Federal Housing Administration (FHA) and the community. The Hyde Park-Kenwood Conservation Community Council (CCC), the official body through which the local community participates in urban renewal decisions, approved the LVA § 236 project. Thereafter, the City of Chicago Plan Commission, the City Council Committee on Buildings and Zoning, and the City Council approved the necessary zoning ordinances.

In May 1971 the SECC objected to the project on the ground that it would concentrate low-income blacks in the area. On July 15, 1971 a conference was called by HUD and FHA—at SECC's request

and in response to its objections to the project. The parties were represented by counsel and made oral and written presentations.

On July 23, 1971, HUD prepared its own analysis. Its conclusion was that the LVA project was likely to have an integrated occupancy. It also noted that there was a great need for Section 236 units in Hyde Park-Kenwood due to displacement of former black residents during urban renewal.

On July 26, 1971, Ernest Stevens, Director of the Chicago FHA Insuring Office, issued his administrative determination. He concluded that there was a reasonable probability that the project would be racially mixed. He also concluded that there was a great need for low income housing in this area. In order to further the integration objective, Stevens ordered: (1) the Section 236 income limits waived on 20 per cent of the project's units; (2) Section 221(d) (3) exception income limits applied to all two-bedroom units; (3) the staging of three-bedroom units to delay their availability until after the highrise units had been rented; and (4) a detailed plan of tenant selection procedures devised to attain the maximum possible racial mixed in the occupancy of the project. LVA complied. Shortly thereafter, this suit was filed.

### COUNT I

In Count I, plaintiffs demand a declaration that their rights under the Fifth and Fourteenth Amendments to the Constitution of the United States, the National Housing Act, and the 1964 and 1968 Civil Rights Acts (42 U.S.C. § 2000d et seq.; 42 U.S.C. § 3601 et seq.) have been violated, and that they have a right to prevent the use of federal subsidy programs to sponsor the LVA project. They also seek an injunction prohibiting the federal defendants and the City of Chicago from approving mortgage insurance, an interest reduction subsidy, or rent supplement funds for the project.

The specific claim urged in support of an injunction is that the subsidies will increase racial concentration and segregation in violation of plaintiffs' constitutional and statutory rights and the federal defendants' responsibilities.

With respect to the latter, plaintiffs argue that the recently effectuated HUD Project Selection Criteria, 37 Fed. Reg. 203 (January 7, 1972), set the standard for the federal defendants' statutory duty—even though these regulations became effective after the project was initially funded—because it is the law in effect at this time. See Thorpe v. Housing Authority of the City of Durham, 393 U.S. 262, 281–82, 89 S. Ct. 518, 21 L.Ed.2d 474 (1969). This Court recognizes the general rule that an appellate court must apply the law in effect at the time it renders its decision, but that rule must be reconciled with the Fifth Amendment's prohibition of deprivation of property without due process of law. *Thorpe*, supra, at 278–81, 89 S.Ct. 518. Here the plaintiffs are asking the Court to apply a new and subsequent standard to pre-existing contractual obligations and rights. This was not the case in *Thorpe* or in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 417–18, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Plaintiffs here seek precisely what the Supreme Court in *Thorpe* said would be a "far different case." *Thorpe*, supra, at 279 n. 33, 89 S.Ct. 518. Although this Court is aware of certain cases in which the Supreme Court has upheld particular legislation despite effects upon contract rights, it cannot on the present facts superimpose regulations which were not specifically stated to be retroactive. See Permian Basin Area Rate Cases, 390 U.S. 747, 779–80, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968); Lynch v. United States, 292 U.S. 571, 579, 54 S.Ct. 840, 78 L.Ed. 1434 (1934); Home Bldg. & Loan Ass'n v. Blaisdell, 290 U.S. 398, 431, 54 S.Ct. 231, 78 L.Ed. 413 (1934).

In reviewing the federal defendants' determination that the LVA 236 project would not significantly increase racial

concentration in Hyde Park-Kenwood, this Court's scope of review is narrow. 5 U.S.C. § 706; *Overton Park*, supra, at 414, 91 S.Ct. 814; Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809, 822 (3d Cir. 1970). After reviewing the voluminous exhibits in this case and Stevens' Administrative Determination, the Court concludes that the agency's decision was an "informed one." *Shannon*, supra, at 822. The officer acted within the scope of his authority; his decision was based on a consideration of the relevant factors; there was no clear error of judgment; and the agency action followed the necessary procedural requirements. See *Overton Park*, supra, at 414, 91 S. Ct. 814.

## COUNT II

In Count II, plaintiffs attack the administrative process utilized by FHA as unfair and inadequate, and as a denial of plaintiffs' right to procedural due process. Specifically, plaintiffs contend they were entitled to transcription of the July 15, 1971 conference by a court reporter, the right to cross-examine parties appearing at the conference, and advance notice of the other parties' claims. Plaintiffs also attack the impartiality and objectivity of the HUD and FHA officials. This is not a meritorious claim, as indicated under Count 1, supra.

In essence, plaintiffs seek a review *de novo* of an administrative determination. However, as the *Shannon* court noted, the judgment made by HUD in a case like this is a quasi-legislative one (436 F.2d at 821), and plaintiffs' rights are adequately protected by their opportunity to obtain judicial review pursuant to the Administrative Procedure Act (5 U. S.C. § 706) after the agency decision. *Shannon*, supra, 436 F.2d at 821. In the absence of statutory power for a *de novo* review, and there being no apparent abuse of discretion or "plain error," the Court cannot appropriately inquire further whether plaintiffs' rights were violated by the procedures used at the July 15, 1971 conference.

## COUNT III

Count III charges that the federal defendants have knowingly administered the federal low and moderate income housing programs in the Chicago metropolitan area and other metropolitan areas in a racially discriminatory manner by confining the housing developments assisted under these programs almost exclusively to areas of high racial concentration. Plaintiffs seek to enjoin the administration of the programs in this manner and request affirmative relief. The federal defendants have moved to dismiss on the ground that plaintiffs lack standing.

The test for standing is (1) "whether the plaintiff alleges that the challenged action has caused him injury in fact, economic or otherwise," and (2) "whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." Association of Data Processing Service Organizations v. Camp, 397 U.S. 150, 152–53, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970).

In their complaint, plaintiffs claim that the federal defendants' actions have injured them by depriving them of the opportunity to work and/or reside in a stable, integrated community, and by imposing upon them the evil characteristics of segregation. These allegations, which must be accepted as true on a motion to dismiss, clearly are injuries in fact under the *Data Processing* test.

The remaining question is whether the plaintiffs are within the zone of interests to be protected by the statutes in question. The Court may only find standing under the National Housing Act; however, the precedents under this statute do not appear to extend standing to these plaintiffs. Plaintiffs are not *minority group* residents removed by virtue of site acquisition, nor are they potential residents of federally assisted housing projects. See Norwalk CORE v. Norwalk Redevelopment Agency, 395 F. 2d 920, 927 (2d Cir. 1968); Gautreaux

v. Chicago Housing Authority, 265 F. Supp. 582, 583 (N.D.Ill. 1967). And since the responsible agencies have found—without appellate challenge— that the LVA § 236 project meets applicable statutes and regulations, the plaintiffs are not suing as residents and businessmen of a community which predictably will be damaged by the erection of a federally subsidized housing project. See *Shannon*, supra, 436 F.2d at 817–18.

However, Congress has repeatedly affirmed the goal of the federal housing program as "a decent home and a suitable living environment for every American family." 12 U.S.C. § 1701t (Housing and Urban Development Act of 1968); 42 U.S.C. § 1441 (National Housing Act). We are not aware of any housing cases expanding the right to a suitable living environment beyond residents or businessmen of a community attacking public housing in their community. Nevertheless, given the trend toward expansion of the classes of persons deemed by the courts to have standing to sue, the Court cannot say that a group of residents in one neighborhood of a city cannot attack agency policy which fosters segregation in that city. Since plaintiffs have attacked the federal defendants' policy in Chicago, the Court need not reach the broader question of standing to sue against allegedly racist housing programs in other cities.

■ But allegations which will survive a motion to dismiss will not necessarily support the issuance of a preliminary injunction. Plaintiffs have shown little or no probability of success on the merits, or of irreparable injury, or that the balance of the equities lies with them. Indeed, issuance of an injunction at this time might seriously injure those who are in need of this hous-

ing, and issuance of an injunction certainly would occasion losses to these defendants. *Cf.* Croskey Street Concerned Citizens et al. v. Romney et al., 459 F. 2d 109 (3d Cir. 1972).

### COUNT IV

■ Count IV of the complaint alleges that the building of a low income Section 236 project on HR1B violates LVA's contractual obligations under the terms of its redevelopment agreement with the City of Chicago, by which it acquired title to this property. Plaintiffs contend that they are the intended or third party beneficiaries of this "agreement" and seek specific performance of its terms.

This Court concludes that a contract never arose between LVA and the City on LVA's original proposal to build a luxury highrise on HR1B. Rather, LVA's original proposal was rejected and was withdrawn. Therefore, there was no contract. Construction, Inc. v. Rockwood Borough Municipal Authority, 326 F.2d 751, 752 (3d Cir. 1964); Automatic Voting Machine Corp. v. Daley, 409 Ill. 438, 449, 100 N.E.2d 591, 596–97 (1951). This conclusion is supported by DUR's June 20, 1967 resolution. The "proposal" referred to in paragraph three thereof clearly is the proposal contained in the LVA-UDF-Amalgamated memorandum agreement, not the original LVA offer. Accordingly, the beneficiary issue need not be reached.

### ORDER

For the foregoing reasons, Counts I, II and IV of the complaint will be dismissed, with judgment thereon for defendants. The federal defendants' motion to dismiss Count III is denied.