706 A.2d 1187

THEODORE R. MURNICK, PLAINTIFF–APPELLANT, v. NEW JER-SEY HOUSING AND MORTGAGE FINANCE AGENCY AND 725 PARK AVENUE ASSOCIATES, L.P., DEFENDANTS–RESPON-DENTS.

Superior Court of New Jersey
Appellate Division

Argued February 4, 1998—Decided March 11, 1998.

Before Judges D'ANNUNZIO, RODRIGUEZ and COBURN.

*Bruce H. Snyder*, argued the cause for appellant (*Lasser & Hochman*, attorneys; *Mr. Snyder*, on the brief).

*Stephanie Haegley*, Deputy Attorney General, argued the cause for respondent New Jersey Housing and Mortgage Finance Agency (*Peter Verniero*, Attorney General, attorney; *Joseph L. Yannotti*, Assistant Attorney General, of counsel; *Richard L. Evert*, Deputy Attorney General, on the brief).

*Dennis Calo*, attorney for respondent *725 Park Avenue Associates L.P.* joins in the brief of respondent New Jersey Housing and Mortgage Finance Agency.

The opinion of the court was delivered by

D'ANNUNZIO, J.A.D.

Plaintiff, Theodore R. Murnick, commenced this action against the New Jersey Housing and Mortgage Finance Agency (Agency) and 725 Park Avenue Associates, L.P. (Associates) to set aside the Agency's approval of Associates' project in East Orange to construct fifty low and moderate income rental units. Plaintiff now appeals from a summary judgment.

The Agency facilitates financing of housing projects pursuant to its enabling statute, *N.J.S.A.* 55:14K–1 *et seq.* Associates applied to the Agency for financing in 1995, and it was approved over plaintiff's objection in 1996. Plaintiff commenced this action on July 24, 1996. He alleged in his complaint that the project "will have the effect of increasing the already high concentration of low income black residents in East Orange, New Jersey." He charged that the Agency "had no procedures for consideration of, and in fact did not consider its effect on, racial concentration in that neighborhood or in the city of East Orange as a whole," and that the Agency's procedures "were not in adequate compliance with the 1949 Housing Act or the 1964 and 1968 Civil Rights Acts." Plaintiff also alleged that the Agency's approval of the project "will have the effect of increasing or maintaining racial concentration which is likely to lead to urban blight" and that "local housing authorities are under an affirmative duty to promote and achieve integration in housing."

In his complaint, plaintiff sought the following relief:

A. Determining and declaring that in reviewing and approving the Park Avenue project, NJHMFA had no procedures for consideration of, and in fact did not consider, its effect on racial concentration in the neighborhood and in the City of East Orange as a whole;

B. Determining and declaring that the location of the Park Avenue project on the site chosen will have the effect of increasing the already high concentration of low income black residents in East Orange;

C. Enjoining and restraining defendant NJHMFA from issuing its Multi–Family Housing Revenue Bonds, 1996 Series, in connection with the project of defendant 725 Park Avenue Associates, L.P. located at 725 Park Avenue, East Orange, New Jersey;

D. Enjoining and restraining defendant NJHMFA from closing on its mortgage commitment for permanent financing with respect to the Park Avenue project;

E. Enjoining and restraining defendant NJHMFA from closing on the second mortgage from its Administrative Account.

Shortly after filing its answer the Agency moved for summary judgment. The record before the motion judge, consisting of affidavits, demographic studies, financial analysis, market analyses and other relevant material, exceeds five hundred pages. The court granted summary judgment on the ground that there was no

attempt by the Agency to foster patterns of segregated housing and that its actions did not have that effect. Judgment was also granted in part on plaintiff's motivation for opposing the project. The court found that he is a competing landlord.

Judgment was entered on October 11, 1996 and plaintiff filed a timely notice of appeal. While this appeal was pending, the Agency moved to dismiss on the ground that the issue was moot because the project had been built and the financing provided. We reserved consideration of the motion until the appeal was calendared and argued.

To place the issues in some perspective before we address the Agency's motion to dismiss, we shall refer to some aspects of the record.

East Orange is a city in Essex County with a population of approximately 70,000 persons. At least ninety percent of its population is African–American. The East Orange governing body approved the project by a vote of eight to one, adopting a resolution to be relied on by the Agency in which the governing body stated that the project will meet or meets an existing housing need. The resolution included an undertaking that the governing body would exempt the project from taxation in return for an agreement by the project's sponsor to make annual payments to the municipality in lieu of taxes.

The record also contains a letter from Mayor Cardell Cooper of East Orange to the Commissioner of New Jersey's Department of Community Affairs. In the letter, Mayor Cooper urged that the project be funded. The mayor noted that the project "will provide attractive, convenient, and most importantly, affordable housing for most families." He also stated:

> The Park Avenue Apartments will also have a dramatic impact on stabilizing this neighborhood by developing the only vacant property in this particular area.
>
> The property, which has been vacant for nearly 15 years, is located near a major thoroughfare for public transit accessibility and convenience. The property currently is an eyesore and residents in the immediate area look forward to its development.

In effect, not only would renovating this property provide housing for many in need, it would also contribute to rebuilding this particular neighborhood. I hope that the state will be our partner in this very important venture.

Shirley Bishop, the Executive Director of the Council on Affordable Housing (COAH), submitted an affidavit in support of the State's motion for summary judgment. . She stated that East Orange's net indigenous need of affordable housing was 215 units and that she was unaware of any reason "under the Fair Housing Act or COAH's rules and regulations, as to why the City of East Orange should be prohibited in this litigation from rehabilitating 725 Park Avenue, East Orange, which effort would provide fifty new units for low and moderate income families."

Plaintiff owns approximately 1,100 multi-family housing units in New Jersey, approximately 400 of them in East Orange. In his affidavit, plaintiff stated in part:

13. At present, there is a very high vacancy rate in East Orange with regard to low income residential apartment units. In fact, the four (4) residential apartments that I own and operate in East Orange, New Jersey presently contain more than fifty (50) vacancies.

14. The NJHMFA failed to set forth evidence of any study which it utilized or conducted prior to approving the financing.

15. Thus, rather than to extract low income residents from existing buildings in East Orange and to relocate them in the Park Avenue Project, a careful and updated survey of affordable housing units should be made in an effort to fill the current vacancies rather than to create new vacancies by the construction of an additional fifty (50) unit low income housing project.

16. The Park Avenue Project will also serve to create an undue financial burden on me as well as other similarly situated landlords since it will create additional vacancies in an already deteriorating housing market.

17. Accordingly, the construction of the Park Avenue project would serve only to increase the low-income minority population. Such an increase will have the effect of further perpetuating racial segregation.

The economic concerns plaintiff expressed in his affidavit were consistent with the concerns he expressed orally at the Agency's hearing on June 20, 1996. At that hearing, however, plaintiff also adopted by reference the comments of Peter O'Connor, counsel for the Camden County NAACP and Colandus Francis, Vice President of the Camden County NAACP. The NAACP, through its spokespersons, expressed concern that the Agency's decision re-

garding a specific project in Camden could have the effect of perpetuating housing and school segregation in Camden County. When the Agency's representative assured O'Connor and Francis that the Camden project was not being considered at the hearing, they withdrew.

In *Shannon v. United States Dept. of Housing and Urban Dev.*, 436 *F.*2d 809 (3d Cir.1970), opponents of a subsidized housing project to be located in a Philadelphia neighborhood successfully advanced a similar argument. In language that echoes plaintiff's allegations in the present case, the Court of Appeals stated:

Even though previously located rent supplement projects were located in non-ghetto areas the choice of location of a given project could have the "effect of subjecting persons to discrimination because of their race ... or have the effect of defeating or substantially impairing accomplishment of the objectives of the program or activity as respect persons of a particular race...." 24 C.F.R. § 1.4(b)(2)(i). That effect could arise by virtue of the undue concentration of persons of a given race, or socio-economic group, in a given neighborhood. That effect could be felt not only by occupants of rent supplement housing and low cost housing, but by occupants of owner occupied dwellings, merchants, and institutions in the neighborhood. Possibly before 1964 the administrators of the federal housing programs could, by concentrating on land use controls, building code enforcement, and physical conditions of buildings, remain blind to the very real effect that racial concentration has had in the development of urban blight. Today such color blindness is impermissible. Increase or maintenance of racial concentration is prima facie likely to lead to urban blight and is thus prima facie at variance with the national housing policy. Approval of Fairmount Manor under the "red line" procedure produced a decision which failed to consider that policy.

[*Id.* at 820–21.]

The Court of Appeals reversed the trial court's dismissal of the complaint and remanded for a determination by HUD "as to whether the location of [the project] ... will enhance or impede a workable program for community improvement in conformity with the Civil Rights Act of 1964 and 1968." *Id.* at 823.

Thus, the Court of Appeals did not determine that HUD should not have approved the project. The Court's concern at that stage of the litigation was with HUD's failure to give adequate consideration to the discriminatory effect of its decision and its failure to have an institutionalized procedure to address those concerns. In this vein, the Court of Appeals stated:

Nor are we suggesting that desegregation of housing is the only goal of the national housing policy. There will be instances where a pressing case may be made for the rebuilding of a racial ghetto. We hold only that the agency's judgment must be an informed one; one which weighs the alternatives and finds that the need for physical rehabilitation or additional minority housing at the site in question clearly outweighs the disadvantage of increasing or perpetuating racial concentration.

[*Id.* at 822.]

There are many factual differences between the present case and *Shannon.* We need not develop them, however, because we accept the premise that government decisions regarding the location of public housing or subsidized private-sector housing can have an impact on racial demographics. The issue before us is whether this appeal should be dismissed because it is moot.

The Agency moves to dismiss the appeal because the project has been constructed, the Agency has issued its bonds, and it has funded the permanent financing for the project. Plaintiff opposes the motion on the ground that "there nevertheless remains substantial relief which the Court could grant, including prospective relief to require the [Agency] to adopt formal policies to assure that its funding decision alleviate, rather than aggregate, racial segregation in East Orange and Essex County." Plaintiff also contends that the issue is "of great public importance, virtually certain to reoccur, and yet evading judicial review," and, therefore, the motion to dismiss should be denied.

We conclude that the appeal should be dismissed as moot because the relief plaintiff seeks specific to the project, *i.e.,* rescinding the financing, cannot be accomplished without significant and substantial impairment of the project and the rights of third parties. *But cf. Shannon, supra,* 436 *F.*2d at 822 (where the Court of Appeals refrained from finding the case moot and, instead, considered possible forms of equitable relief). We are influenced in our decision by the availability of an alternative avenue to achieve prospective relief.

Section 4(f) of the Administrative Procedure Act, *N.J.S.A.* 52:14B–4(f), authorizes an interested person to "petition an agency

to promulgate, amend or repeal any rule." Within thirty days of the receipt of such a petition, "the agency shall either deny the petition, giving a written statement of its reasons, or shall proceed to act on the petition, which action may include the initiation of a formal rule-making proceeding." *N.J.S.A.* 52:14B–4(f)(3). Significantly, the Act requires that notice of the petition and of "formal agency action" on the petition be published in the New Jersey Register. *Ibid.*

A petition for promulgation of a rule will afford the Agency a structured opportunity to consider plaintiff's position outside the framework of adversarial litigation. The Agency did not previously have such an opportunity. Plaintiff's statements at the Agency's hearing on June 20, 1996 were limited to the economic impact of the project, particularly with regard to competing apartment buildings. Although he told the Agency that he was adopting the comments made by the NAACP representatives, the NAACP did not press the issue because the Camden project was not being considered.

A rule-making petition would permit participation by all interested parties, including representatives of the African–American community who, notably, have not participated in this case. *Cf. SMB Assocs. v. New Jersey Dept. of Envtl. Protection*, 264 *N.J.Super.* 38, 54, 624 *A.2d* 14 (App.Div.1993) (adoption of a waiver rule permits public participation in shaping waiver criteria), *aff'd,* 137 *N.J.* 58, 644 *A.2d* 558 (1994). We do not assume that all members of the African–American community would agree with plaintiff's position. Full adoption of it may impair the construction or rehabilitation of needed housing in predominantly African–American communities. While such a result may benefit existing landlords, it may not be in the best interests of those communities.

We are persuaded, therefore, that a rule-making petition is the most effective means of initially addressing the issue plaintiff raises and is consistent with the doctrine requiring exhaustion of administrative remedies. *See Abbott v. Burke,* 100 *N.J.* 269, 297–

300, 495 *A*.2d 376 (1985) (discussing rationales for the exhaustion requirement); *Paterson Redev. Agency v. Schulman,* 78 *N.J.* 378, 387, 396 *A*.2d 573 (explaining how an exhaustion requirement allows agencies to make factual determinations or legislative interpretations within their expertise), *cert. denied,* 444 *U.S.* 900, 100 *S.Ct.* 210, 62 *L.Ed.*2d 136 (1979). Indeed, if the plaintiff had appealed directly to this court under *R.* 2:2–3(a)(2), as arguably he should have, it is likely that we would have remanded to the Agency for full consideration of the issue.

The appeal is dismissed on grounds of mootness, but without prejudice to a petition for rule-making under *N.J.S.A.* 52:14B–4(f).