Application óf William JONES et al.,
Petitioners,

v.

Michael E. TULLY, Jr., and Town of
North Hempstead, First
Respondent,

Hector H. Gayle, Executive Director,
et al., Second Respondents,

James F. Lynn, Secretary, Department of
Housing and Urban Development,
Third Respondent.

73 C 1104.

United States District Court,
E. D. New York.

June 26, 1974.

Robert Rivers, Westbury, N. Y., for petitioners.

Richard J. Osterndorf, Mineola, N. Y., for first respondent.

Ralph A. Nappi, Port Washington, N. Y., for second respondents.

David G. Trager, U. S. Atty., by Harold Friedman, Asst. U. S. Atty., for third respondent.

BARTELS, District Judge.

In the last few years federal courts have been faced with mounting problems in determining whether. the United States Department of Housing and Urban Development ("HUD") has violated the Civil Rights Acts of 1964 and 1968 in site selections for locations for federally assisted housing projects in areas of racial concentration. Here we are concerned with the racial and socio-economic effects of the construction of a proposed one hundred unit low- and moderate-income housing project ("the Project") on a site selected by HUD in "Spinney Hill", a predominantly black area within the Town of North Hempstead, Nassau County, State of New York ("the Town"). Petitioners, several individuals who reside in Spinney Hill, and the Great Neck Manor Civic Association,[1] an association of property owners in Spinney Hill, have instituted this class action against the Town, the Local Urban Renewal Agency, established by the Town as its Local Public Agency under the Housing Act of 1949, 42 U.S.C. § 1451(b), ("The LPA"), and HUD to enjoin the construction of the Project, contending that the construction of the Project will perpetuate racial concentration in the Spinney Hill area in violation of § 601 of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, and § 808 of the Civil Rights Act of 1968, 42 U.S.C. § 3608. Jurisdiction is predicated upon 28 U.S.C. §§ 1331, 1343.

### Introduction

In order to obtain funds from HUD, the Town Board must make an acceptable application. In this case the Town Board determined that the Spinney Hill area is a "substandard and unsanitary" area appropriate for urban renewal, and has designed the Project to replace existing structures, 80% of which the Town Board has determined to be "blighted," with commercial, residential and recreational buildings. HUD committed itself to fund the Spinney Hill Project under its Neighborhood Development Program ("NDP"), which authorizes funding of such projects in annual increments. As finally approved by HUD, the Project involves Federal grants and loans for site acquisition only, with support for actual construction to be provided under New York State's "Mitchell-Lama" Program, N.Y. Private Housing Finance Law § 10 (McKinney's Consol. Laws, 44B, supp. 1973). Petitioners allege that the Town and the LPA have deliberately selected the predominantly black Spinney Hill area to locate the

---

1. Although challenged, both individual petitioners, as residents of the neighborhood, and the Great Neck Manor Civic Association, consisting of such residents, have standing as "aggrieved" persons under the Administrative Procedure Act, 5 U.S.C. § 702. Association of Data Processing Service Org., Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970); Shannon v. United States Dept. of Housing & Urban Dev., 436 F.2d 809 (3d Cir., 1970).

Project, which is also expected to be predominantly black, and have made no attempt to acquire non-segregated sites within the Town for the location of additional low- and moderate-income housing projects. It becomes necessary, therefore, to examine the factors, procedures and information utilized by HUD in approving the Spinney Hill site for assistance under the Neighborhood Development Program.

According to the Neighborhood Development Program Handbook, an application for assistance will not pass beyond the preliminary screening stage unless there is an affirmative finding for each of the following six prerequisites: (1) Workable Program; (2) Local General Plan (official documents concerning land use, zoning ordinance and map, subdivision regulations to serve as a comprehensive guide for the physical development of the locality as a whole); (3) Civil rights (evidence of compliance with Title VI of the 1964 Civil Rights Act and Executive Order 11246); (4) Relocation Requirements (compliance with Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970); (5) A–95 Coordination (procedure involving review of applications under the Office of Management and Budget Circular A–95); and (6) Housing Component (absence of any known barrier which would preclude all assisted housing sites in the project area from receiving at least an adequate rating on the Housing Production and Mortgage credit project selection system).

### The Town's Workable Program

Under the provisions of the Housing Act of 1949, 42 U.S.C. § 1451, before any Federal urban renewal assistance may be made available in a community, including that under the Neighborhood Development Program, that community must submit to HUD an acceptable "workable program for community improvement" including "an official plan of action . . . for effectively dealing with the problem of urban slums and blight within the community and for the establishment and preservation of a well-planned community with well-organized residential neighborhoods of decent homes and suitable living environment for adequate family life." HUD's initial acceptance or certification of a community's workable program is valid for only two years and recertification is predicated on a review of the progress submitted by the community to HUD biannually thereafter. Under § 1451 HUD is required to determine that (1) the workable program is of sufficient scope and content to furnish a basis for evaluation of the need for the urban renewal project, and (2) the project is in accordance with the program. Under the Civil Rights Act of 1968, 42 U.S.C. § 3608(d)(5), HUD is also required to administer the programs relating to housing and urban development "in a manner affirmatively to further the policies" of the Act against discrimination.

As required by its workable program procedure, HUD exercised supervision and control over the Town's efforts to provide non-segregated low- and moderate-income housing to avoid the perpetuation of racial concentration. For example, in March, 1971, before the Spinney Hill NDP was proposed, HUD withheld recertification of the Town's workable program pending the submission of evidence of its efforts to provide relocation housing outside racially concentrated areas for those displaced by governmental redevelopment programs, a concept of scatter-site housing. Only after the Town Board unanimously passed a resolution expressing its intent "to utilize all resources available to encourage construction of low- and moderate-income housing outside areas of racial concentration for residents of all races and economic mixes . . ."[2] was recertification granted by HUD. Pursuant to this commitment the Town

2. Resolution # 369–1971, June 15, 1971.

Board proposed three sites to HUD, two of which, the Cutter Mill and Port Washington Boulevard sites, were approved in March, 1972. The third proposed project, for twenty-six low-income units in the Spinney Hill area, was rejected by HUD's Equal Opportunity Division because it was in an area of racial segregation. The Cutter Mill site is located in a predominantly white neighborhood and will accommodate approximately seventy low-income units, while the Port Washington Boulevard site will accommodate approximately twenty-eight low-income units in an area adjacent to an existing predominantly black housing project. The two projects were approved as a package by HUD with the less costly Port Washington Boulevard site making the more costly Cutter Mill site feasible. In January, 1973, a challenge to the Cutter Mill project was raised by a community group based primarily on its environmental impact which is presently under study both by HUD and by the New York State Department of Environmental Conservation.

### The Spinney Hill Application

The current Spinney Hill Project, approved for its first year of funding under the Neighborhood Development Program in September, 1972, called for acquisition of nine acres of land and two hundred housing units to be funded under the federally subsidized housing program, 12 U.S.C. § 1715z–1, for which HUD allowed the Town a $1,400,000 loan and a $1,300,000 capital grant for first year site acquisition. Because of a moratorium on funding of federally subsidized housing in 1973, the Project was modified in the first year to obtain other sources for financing. Accordingly, the second year NDP application was adjusted to accommodate only one hundred units of housing to be financed under the "Mitchell-Lama" program, NYPHFL

§ 10 (McKinney's supp. 1973). The Town's plan provided that the land originally acquired in the first year, together with an additional fourteen parcels funded by HUD, would be sold to a developer in a package upon the condition that the profits on the commercial development would be employed to reduce rents on the one hundred units of housing. Further rent supplements were to be added from a fund already contributed by various local organizations, including the Inter-Faith Council of Manhasset. Pursuant to this application, HUD approved a $1,175,000 grant and a $1,612,643 loan to the Town for acquisition of the fourteen parcels.

Before the Spinney Hill NDP was approved, and pursuant to the requirements of the Housing Act of 1949, 42 U.S.C. § 1455(d), public hearings were held, first by the Town's Planning Board in May, 1972, and then by the Town Board in June, 1972. Public notice was given in advance of the Town Board hearings through posting of notices in conspicuous places about the Town and by publication in The Great Neck Record on June 1st and June 8th, 1972. Various speakers at the hearings recounted the conditions of overcrowding, crime, and drug use which were present in the redevelopment area and expressed their views in favor of the Project, explaining how the Project would alleviate these conditions. At these hearings the attorney for the petitioners and petitioner Jones on behalf of the Great Neck Manor Civic Association [3] opposed the Project. A number of other area residents and representatives of local civic and civil rights organizations including the local chapter of the NAACP and the Manhasset Inter-Faith Council, spoke in favor of the Project. A petition signed by 700 area residents supporting the Project was also presented to the meeting. After hearing the voice of the area residents, the Town Board

---

3. Some members of the Great Neck Manor Civic Association took action to disassociate themselves from this lawsuit and expressed their support for the Project in letters to the LPA after being named as individual petitioners. (Letters of Ella J. Harris, Alberta Johnson, William Harris, July 26, 1973; Letter of Thomas T. Holmes, August 2, 1973.)

unanimously approved the Project on June 13, 1972 in compliance with 42 U.S.C. § 1469(c)(1).

*HUD's Evaluation*

The Town's application for funding under the Neighborhood Development Program was evaluated under the procedures set out in HUD's NDP Project Selection System, 24 CFR §§ 511 et seq., and was approved for its first year of funding in September, 1972. Under this system, applicants for assistance under the Neighborhood Development Program, such as the Town of North Hempstead, are required to submit "acceptable assurances of compliance with the Civil Rights Act of 1964, . . . and HUD title VI regulations 24 CFR Part I, . . ." as a prerequisite to further consideration of their application, 24 CFR § 511.4(c). Once this and other prerequisites have been met, HUD is obligated to evaluate pursuant to § 511.20 the degree to which the locality in which the Project is to be located "has a realistic plan to expand the supply of standard low- and moderate-income housing in a nondiscriminatory way outside areas of concentration of economically disadvantaged or minority citizens."

The affidavits of HUD officials clearly establish that the Project was evaluated under this selection system pursuant to which HUD determined that (1) the prerequisite of "acceptance assurance of compliance with the Civil Rights Act of 1964, . . ." 24 CFR § 511.4 (c), was met by the expressed commitment of the Town Board to equal opportunity in housing as evidenced by its resolution of June 15, 1971 and its proposal of the Cutter Mill and Port Washington Boulevard sites; (2) the Town deserved an "adequate" rating upon the question of whether there had been a significant expansion of the supply of standard housing for low- and moderate-income families in a nondiscriminatory way, and a "good" rating on the question of whether it had a realistic plan for the expansion of such housing outside areas of racial concentration, 24 CFR § 511.20; (3) one of the objectives of the Spinney Hill NDP was to promote equal housing opportunities and to encourage a reduction in the concentration of minority group persons within the Spinney Hill community; (4) the Project received the support of numerous community groups and many area residents who expressed their support at the two public meetings held by the Town in 1972 and by the petition supporting the Project signed by 700 area residents; (5) a pressing need existed for such housing in the Town as evidenced by an extremely low vacancy rate of 2.2%; and (6) the Project was part of a Town-wide effort to expand low- and moderate-income housing on an integrated basis.

In this evaluation HUD utilized the reports of the Equal Opportunity Division of its New York Office made in connection with both the first and second year Spinney Hill NDP applications which included data on the racial composition of the Town and the Spinney Hill area. The report on the second year application identified specific areas proposed by the Town for relocation outside areas of racial concentration of the 54 persons to be displaced from their homes by construction of the Project.[4] It also found that the Project would contribute to dispersement of low income and minority family concentration in the area by its marketing program which was designed to achieve a balance of

4. Consisting of private rental market and sales; 66 units of state-aided family public housing; 89 units of federally-funded housing and 110 units of Mitchell-Lama housing. In addition, contrary to petitioners' allegation that the Project would burden the Manhasset School District, HUD's Equal Opportunity Division found that the Project would be located in the Great Neck School District which has a minority enrollment of 4% rather than the Manhasset School District which has an 11% minority enrollment, thus contributing to the desegregation of the North Hempstead School System. (Report of Grace Malone, Equal Opportunity Division, June 11, 1973).

80% middle-income to 20% low-income occupancy.

### Complaint and Investigation

After approval of the first year NDP application in September, 1972, petitioners had 90 days to file a complaint under HUD's administrative complaint procedure, 24 CFR § 1.7. They did not do so. Instead, petitioners waited until July, 1973, to file their complaint in this action, which came before this Court for the first time in August, 1973, at which time they sought a preliminary injunction to halt construction of the Project. At the Court's suggestion, HUD's attorney agreed to waive the 90-day period within which such a complaint could be filed,[5] and the matter was adjourned until a formal complaint could be made to HUD and a further investigative report filed by it. Such a complaint was filed with HUD by petitioners on September 6, 1973, and HUD accordingly conducted a second thorough review of the Project. HUD's regional Equal Opportunity Office, in investigating the complaint, conducted meetings with the complainants, local redevelopment officials and HUD program personnel, and reviewed HUD files. The investigative report filed on November 5, 1973, concluded that there was no merit in the complaint, noting that both HUD and the Town were "aware of, considered, and acted upon Equal Opportunity concerns" with respect to the Spinney Hill NDP and the Town's workable program for community improvement in general. The report found that the Town had taken affirmative steps to implement a policy of equal housing opportunity in spite of the fact that the construction of the Cutter Mill site was delayed pending the study of its environmental effects. This report was further reviewed and concurred in by HUD's Assistant Regional Administrator of Equal Opportunity, on the basis of the insistence of HUD's New York office that the Town Board officially commit the Town to a policy of equal housing opportunity and the Town's affirmative steps to implement that policy.

### Standard of Review

The Civil Rights Act of 1964, which prohibits racial discrimination under programs receiving Federal financial assistance, 42 U.S.C. § 2000d, provides that agency action taken with respect thereto [6] "shall be subject to such judicial review as may otherwise be provided by law for similar action taken by such department or agency on other grounds . . . ," 42 U.S.C. § 2000d–2. Since HUD's actions in approving the Project under its Project Selection Sys-

---

5. The Town and the LPA charged petitioners with laches on the theory that by analogy to the 4-month statute of limitations applicable under New York law to actions against administrative bodies and officers, NYCPLR § 217, petitioners have slept on their rights. See Holmberg v. Armbrecht, 327 U.S. 392, 66 S.Ct. 582, 90 L.Ed. 743 (1946). On the other hand, petitioners argued that New York's three-year limitation applicable to actions brought under a statute, NYCPLR § 214, should be applied by analogy as in other Civil Rights actions, Swan v. Bd. of Higher Education, 319 F.2d 56 (2d Cir. 1963); Ortiz v. La Vallee, 442 F.2d 912 (2d Cir., 1972); Romer v. Leary, 425 F.2d 186 (2d Cir., 1970). Considering the emergency nature of the funding of housing projects, the court believes that the interest of all concerned would be best served in an action brought under the Civil Rights Act of 1964, 42 U.S.C. § 2000d, by the application of the shorter, four-month statute. (See Abrams v. Carrier Corporation, 434 F.2d 1234, 1251–1252 (2d Cir., 1970)), rather than the three-year limitation as applied in the above actions instituted under the Civil Rights Act of 1871, 42 U.S.C. § 1983. Instead of barring petitioners upon this ground, the court felt that petitioners should have a second opportunity to present their objections to the Project, and induced HUD to waive this defense.

6. In order to effectuate the provisions of 42 U.S.C. § 2000d and in accordance with § 2000d–1, HUD promulgated regulations designed to prevent discrimination in federally financed housing programs at 24 C.F.R. § 1.1 et seq. Following the mandate of *Shannon, supra,* HUD developed further procedures to prevent discrimination in its NDP Project Selection System, 24 C.F.R. § 511 et seq., 511.4(c), 511.20.

tem, 24 CFR § 511 et seq., and in rejecting the complaint under 24 CFR § 1.7, constitute department action relative to the anti-discrimination provisions of the Civil Rights Act of 1964, 42 U.S.C. § 2000d, the standard for judicial review, as in similar actions taken by HUD, is provided by the Administrative Procedure Act, 5 U.S.C. §§ 702, 706.

 The review is not a *de novo* or a substantial evidence review, but a thorough, probing in-depth review. Camp v. Pitts, 411 U.S. 138, 93 S.Ct. 1241, 36 L.Ed.2d 106 (1973). The standard of review for informal agency action such as in the present case is enunciated in Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1973), where the Supreme Court, speaking through Mr. Justice Marshall, applied the arbitrary and capricious criteria of Section 706(2)(A) in reviewing the administrative action of the Secretary of the Department of Transportation, stating that:

> "To make this finding the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment . . [citation of cases] Although this inquiry into the facts is to be searching and careful, the ultimate standard for review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." 401 U.S. at 416, 91 S.Ct. at 823.

The Second Circuit in Schicke v. Romney, 474 F.2d 309 (1973), following the mandate of *Overton Park*, applied the same test in reviewing the action of the Secretary of HUD relative to the conversion-substitution of certain tracts of public lands. There Judge Lumbard observed, at pp. 314–315:

> ". . . Since neither the substantial evidence test nor de novo review is authorized, a reviewing court is limited to setting aside informal agency action that does not comply with constitu-

tional, statutory, or procedural requirements or is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.' "

It is incumbent upon the reviewing court to be assured that the Secretary of HUD, in administering the programs and activities relating to housing and urban development, did so "in a manner affirmatively to further the policies" of the Civil Rights Act, which means that HUD in choosing site locations for funding must avoid racial discrimination. See 42 U.S.C. § 3608(d)(5). A leading case in the factual context of the present one is Shannon v. United States Department of Housing and Urban Dev., 436 F.2d 809 (3d Cir. 1970). There the court referred to the interrelationship of the Housing Act of 1949 and the 1964 Civil Rights Act, and reversed the lower court in dismissing a complaint challenging HUD's action in approving a change from an urban renewal plan contemplating owner occupancy to a plan contemplating rental dwellings with rent supplement assistance, upon the ground that it was not predicated upon a consideration of all relevant factors including the racial and socioeconomic factors. The case was remanded for an injunction until HUD had determined whether the site location or the renewal project would further the ends of the Federal housing policy.

Although the *Shannon* court did not rule upon the merits, it held that the Civil Rights Act could be violated without intentional discrimination. *Cf.* Hicks v. Weaver, 302 F.Supp. 619, 623 (E.D.La.1969); Gautreaux v. Chicago Housing Auth., 296 F.Supp. 907 (N.D. Ill.1969). The court held that HUD's choice of a site location which resulted in an undue concentration of persons of a given race or socioeconomic group in a given neighborhood could cause racial discrimination without any intent to discriminate, and suggested that absence of discrimination might not be sufficient, since positive integration was the

objective. However, it conceded that (436 F.2d p. 822):

> "There will be instances where a pressing case may be made for the rebuilding of a racial ghetto."

and concluded that (p. 821):

> "So long as it [HUD] adopts some adequate institutional means for marshaling the appropriate legislative facts the rights of affected residents will be adequately protected, we think, by the opportunity to obtain judicial review pursuant to the Administrative Procedure Act after the agency decision."

This standard was subsequently applied in South East Chicago Commission v. Department of HUD, 343 F.Supp. 62 (N.D.Ill.1972), aff'd 488 F.2d 1119 (7th Cir. 1973).

■ The necessity to rehabilitate a blighted neighborhood and to provide additional low-income housing at a particular site may clearly outweigh the disadvantages of racial concentration. If HUD adopts the proper procedures and considers the relevant factors to effectuate the congressional policy, there is no bar to HUD's approval of a housing project in a predominantly black neighborhood, as it did in this case. See Croskey Street Concerned Citizens v. Romney, 335 F.Supp. 1251 (E.D.Pa.), aff'd, 459 F.2d 109 (3d Cir. 1971). Thus low-income housing and racial concentration at a particular site are not mutually exclusive if justified by the relevant housing factors.

### Conclusion

■■ Site selection is not simple and requires the consideration and balancing of many complex factors. See Ledbetter, Public Housing—A Social Experiment Seeks Acceptance, 32 Law & Contemp. Prob. 490, 504 (1967); Comment, 85 Harv.L.Rev. 870, 878 (1972). A court should not jettison HUD's determination without a finding of arbitrary and capricious action not in accordance with law, which it cannot find in this case. In applying the Administrative Procedure Law framework, the court had before it and examined in depth the administrative record. It directed its attention to HUD's formalized fact-finding procedures, its report, the affidavits of the HUD officials involved in the approval of the project and the investigative report which in fact was a second look at the project made pursuant to the petitioners' administrative complaint. The court also noted the failure of the petitioners to supply affidavits presenting a factual issue as contrasted to their opinions.[7] After closely scrutinizing the allegations of racial discrimination, Southern Christian Leadership Conference v. Connolly, 331 F.Supp. 940 (E.D.Mich.1971), the court concludes that (1) there was no intentional discrimination; (2) HUD's discretion was properly exercised within the framework of the national policy against discrimination in federally funded housing; (3) the record establishes that HUD through its Project Selection System investigated, weighed and balanced all the relevant factors; and (4) its judgment was an informed one without clear error and fully satisfied the requirements of Section 706 of the Administrative Procedure Act.

Accordingly, HUD's motion for summary judgment is granted and the complaint against it is dismissed. The complaint against the Town and the LPA being also predicated on a violation of the Civil Rights Act of 1964, it follows that the approval of HUD's action includes a determination of no discrimination on the part of the Town and the LPA, and likewise mandates a dismissal against both of these respondents.

So ordered.

---

7. Petitioners also failed to reply to the statement of facts not in issue filed by Respondents pursuant to Rule 9(g), General Rules of the

Southern and Eastern District Courts of New York.