The **MARIN CITY COUNCIL** et al., Plaintiffs,

v.

The **MARIN COUNTY REDEVELOPMENT AGENCY** et al., Defendants.

No. C–74–2225 AJZ.

United States District Court,
N. D. California.

April 30, 1976.

Marilyn J. Berger, Legal Aid Society of Marin County, San Rafael, Cal., David B. Bryson, Richard M. Pearl, Cal. Rural Legal Assistance Cooperative Legal Services Center, San Francisco, Cal., for plaintiffs.

James L. Browning, Jr., U. S. Atty., James A. Bruen, Asst. U. S. Atty., San Francisco, Cal., for federal defendant Secretary of HUD; Timothy F. Winchester, Dept. of Housing and Urban Development, San Francisco, Cal., of counsel.

Cecil F. Poole, Jacobs, Sills & Coblentz, San Francisco, Cal., for defendants Highlands Associates, Eugene Ford, Mid-City Financial Corp., Shire West Corp.

Benjamin D. James, Jr., James & McGriff, San Francisco, Cal., William S. Hochman, Bagshaw, Martinelli, Corrigan & Jordan, San Rafael, Cal., for defendant Marin County Redevelopment Agency.

Douglas J. Maloney, County Counsel, County of Marin, San Rafael, Cal., for defendants Marin County Planning Commission and the County of Marin.

## MEMORANDUM OPINION

ZIRPOLI, District Judge.

This lawsuit involves a dispute over the type of housing to be built on the remaining 36 acres of land in the California R–8 Urban Renewal Project located in Marin City.[1] At issue is a letter dated June 7, 1971, from Julian A. Fitzhugh, Program Manager for Area B of the Department of Housing and Urban Development, to James O. Quiett, Chairperson of the Marin County Redevelopment Agency, recommending that no further subsidized housing be built on the 36 acres in question.[2] Plaintiffs seek to set

1. The factual background and history of this case are set forth in the court's Order Granting in Part Defendants' Motions to Dismiss and for Summary Judgment of September 5, 1975. Since the parties have accepted the court's factual description contained therein, the court will not repeat that background information here.

2. That letter stated in pertinent part:
Quite apart from the problem that funds are not available, we believe that for the time being no additional Section 236 rental housing should be constructed in Marin City. Our position is based on the HUD policy that Federal programs should not be used to further impact communities that already have a predominance of low and moderate income families.
In the May 21 meeting, we discussed our mutual interest in the development of a viable Marin City community which could provide needed services and amenities to the residents. We are certain that the moratori-

aside that decision[3] and to have the issue reconsidered in light of certain factors which plaintiffs contend were not previously taken into account.

On September 5, 1975, the court granted defendants' motions to dismiss and for summary judgment on all but plaintiffs' fourth and fifth causes of action. D.C., 416 F.Supp. 700. The fourth cause of action alleged that defendants' decision to exclude further subsidized housing violated plaintiffs' rights under the Fifth and Fourteenth Amendments and under Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d et seq., and Title VIII of the Civil Rights Act of 1968, 42 U.S.C. § 3601 et seq. The fifth cause of action alleged that defendants' failure to assess the racial impact of their decision on the subsequent development of the 36 acres violated plaintiffs' rights under these same constitutional and statutory provisions. After listening to extensive argument on plaintiffs' motion for summary judgment, the court concluded that the issues presented could best be resolved by the taking of oral testimony. Accordingly, the court held a seven-day court trial which included testimony by Julian Fitzhugh, the man most directly responsible for the decision to ban further subsidized housing, and a visit with counsel to the 36 acres themselves. Based on the testimony elicited at the trial, the court concludes that defendants are entitled to judgment and that plaintiffs' claims for injunctive and declaratory relief must be denied.[4]

In its order of September 5, 1975, the court indicated that plaintiffs' fourth and fifth causes of action turn on the resolution of two issues of administrative law: 1) whether the procedures employed in deciding to reject further subsidized housing on the 36 acres constituted an "adequate institutional means for marshaling the appropriate legislative facts," Shannon v. United States Department of Housing & Urban Development, 436 F.2d 809, 821 (3d Cir. 1970); and 2) if the procedures utilized were adequate, whether the decision reached was nevertheless so irrational as to offend against the Administrative Procedure Act, 5 U.S.C. § 706(2)(A). Order at 705. It was within this framework that testimony was taken and it is within this framework that the court reaches its decision.

The key to the resolution of the issues presented by this case lies in the testimony of Julian Fitzhugh, the author of the letter of June 7, 1971. In almost three full days of testimony, he went into almost every facet of the decisionmaking process which

---

um on additional low income rental housing in Marin City is consistent with and supportive of this goal. Moreover, in keeping with the overall development needs of the community, the Agency should concern itself with employment-generating re-uses of the appropriately zoned R–8 land and gear its developer selection criteria accordingly.

3. While the defendants contend that this letter reflected nothing more than a recommendation that no additional subsidized housing he built on the 36 acres, Fitzhugh testified that the effect of that letter was to exclude further subsidized housing from the area. In addition, the evidence indicates that no proposals for subsidized housing for the 36 acres were submitted after that date. The court concludes that it is fair to infer that Fitzhugh's letter of June 7, 1971, had the same effect as a formal determination not to approve further subsidized housing on the 36 acres. Accordingly, the letter of June 7, 1971, will be treated as a final agency decision by Fitzhugh on behalf of the Secretary of HUD.

4. Although defendants still contend that plaintiffs lack standing to bring this lawsuit and that the court lacks subject matter jurisdiction over this case, the court reaffirms its holdings on these issues set forth in its order of September 5. The testimony presented by plaintiffs indicates that plaintiffs have a sufficient stake in the outcome of the case to raise the issues now before the court. Further, the court reaffirms its ruling that it has subject matter jurisdiction over the present controversy. Although the Ninth Circuit has indicated that the Administrative Procedure Act may not constitute an independent grant of jurisdiction, see Nguyen Da Yen v. Kissinger, 528 F.2d 1194 (9th Cir. 1975), in its order of September 5, 1975, the court not only premised its jurisdiction on the Administrative Procedure Act but also on 28 U.S.C. sections 1331 and 1343(4). Since plaintiffs' claims now rest solely on defendants' alleged violations of the constitution and federal civil rights statutes, these two jurisdictional statutes vest the court with subject matter jurisdiction over the case.

led to the letter of June 7, 1971. The following findings are based on his testimony.

In the spring of 1971, Fitzhugh had before him an informal proposal for section 236 subsidized housing submitted by the Marin Urban Development Association (hereinafter "MUDA"). He had agreed to conduct an informal evaluation of the proposal so that MUDA could avoid any substantial expenditure of funds should that informal evaluation indicate that a formal proposal for subsidized housing would not be approved. Accordingly, Fitzhugh evaluated the proposal under a draft of HUD's Project Selection Criteria, the guidelines designed by HUD to be used in evaluating and assigning priorities to formal proposals for subsidized housing.[5] Based on that evaluation, Fitzhugh concluded that were MUDA to submit a formal proposal for subsidized housing, that proposal would receive a rating of "poor" under criteria two and three of the Project Selection Criteria and hence would not be approved.[6] After giving further consideration to the matter, Fitzhugh concluded that *no* proposal for subsidized housing for the 36 acres stood a reasonable chance for approval and funding. He therefore informed the Redevelopment Agency that "for the time being no additional Section 236 housing should be constructed in Marin City." Letter of June 7, 1971, from Fitzhugh to Quiett.

Fitzhugh's conclusion that *no* proposal for subsidized housing on the 36 acres was likely to be approved and funded by HUD was based on two factors. The first was the belief that the Project Selection Criteria themselves precluded the approval of further subsidized housing on the 36 acres. The second was the belief that even if a proposal could achieve a passing rating on the Project Selection Criteria, that proposal would be unable to effectively compete with other proposals for the scarce funds available for subsidized housing in the Bay Area.

In *Shannon v. Department of Housing & Urban Development, supra,* the Third Circuit held that in selecting sites for subsidized housing, HUD must have "before it the relevant racial and socio-economic information necessary for compliance with its duties under the 1964 and 1968 Civil Rights Acts." 436 F.2d at 821; *see Otero v. New York City Housing Authority,* 484 F.2d 1122, 1125 (2d Cir. 1973). The *Shannon* court went on to hold that decisions to locate subsidized housing in areas where the addition of such housing will increase or maintain racial concentration are inconsistent with the goals of the nation's housing policy. 436 F.2d at 821. In response to the Third Circuit's ruling in *Shannon,* HUD developed the Project Selection Criteria. Of particular importance are criteria two and three. Criterion two bars the construction of subsidized housing in an area of minority concentration unless "comparable opportunities exist for housing for minority families, in the income range to be served by the proposed project, outside areas of minority concentration." Criterion three bars the construction of subsidized housing in an area "characterized as one of subsidized housing." Because Marin City is already 95 percent black and because it contains a substantial number of subsidized housing units in addition to a public housing project, Fitzhugh concluded that any proposal for subsidized housing on the 36 acres would not only receive a rating of "poor" under criteria two and three (hence requiring disapproval of the proposal), its approval would also be barred by HUD's statutory duty to act affirmatively to promote integration.

Even if a proposal for subsidized housing could somehow achieve an acceptable rating

---

**5.** Although the criteria were only available in draft form at the time Fitzhugh evaluated MUDA's informal proposal, those criteria were subsequently formally adopted by HUD without substantial change and were published in the Code of Federal Regulations, 24 C.F.R. § 200.700 *et seq.*

**6.** Under the Project Selection Criteria, no project receiving a rating of "poor" could be approved for federal funding.

under the Project Selection Criteria and thereby avoid being placed in the disapproval category, Fitzhugh concluded that the competitive realities governing the allocation of funds for subsidized housing would have made it almost impossible for a proposal for subsidized housing on the 36 acres to be funded. As Fitzhugh testified, the Project Selection Criteria are used not only to determine whether a proposal for subsidized housing is minimally acceptable within the parameters set forth in *Shannon* and *Otero,* they are also used to assign priorities to proposals so that the most desirable and beneficial projects can be funded first. Fitzhugh emphasized that there are only limited funds available for subsidized housing and there are many projects competing for those funds.[7] Because the Project Selection Criteria give the highest ratings to projects which open up new housing areas to minority families, and since they seek to disperse subsidized housing throughout a geographic area rather than concentrating it all in one locality, Fitzhugh concluded that any proposal for subsidized housing in Marin City with its high concentrations of minority families and low income housing units would inevitably lose out to a proposal for subsidized housing in some other area of Marin County, since the rest of the County is predominantly white and well-to-do.[8] He therefore recommended that no further subsidized housing be built in Marin City.

While not attacking the validity of the Project Selection Criteria themselves, plaintiffs contend that in evaluating both the MUDA proposal and the general concept of additional subsidized housing for Marin City, Fitzhugh failed to consider four relevant factors which would have affected the outcome of his evaluation: 1) the possibility of including market rate housing in a proposal for subsidized housing; 2) the effect of the topography of the 36 acre tract; 3) the views of members of the community; and 4) the recommendations of the Marin City Master Plan.

■ Plaintiffs' most persuasive argument is that Fitzhugh did not, and indeed could not within the institutionalized framework governing his decision, evaluate the impact of a proposal for housing on the 36 acres which included both market rate and subsidized housing. Plaintiffs' theory is that such a proposal would not have increased racial impaction but instead would have opened up a new and integrated environment to the inhabitants of Marin City. While such a proposal presents an attractive alternative, the possibility of such a proposal does not undermine the basic rationale of Fitzhugh's 1971 decision. First, at the time Fitzhugh made his decision, such a proposal was not before him. Although he knew that MUDA hoped to build market rate as well as subsidized housing on the 36 acres, the market rate housing proposal was inoperative at the time Fitzhugh evaluated the MUDA proposal for subsidized housing. Fitzhugh believed that he must evaluate the housing situation in Marin City as it existed in the spring of 1971, not as it might exist at some time in the future. The court believes that this conclusion was correct.

Even if Fitzhugh had had a viable proposal for a mixed development on the 36 acres before him, he testified that he still would have concluded that such a proposal was unacceptable. Although the new housing to be built would be integrated, it nevertheless would be adding more subsidized units to an area which already had a high number of such units. Furthermore, it

7. For example, Fitzhugh testified that in 1971 there were 20–25 proposals awaiting section 236 funding in Project Area B (the area over which he has jurisdiction), but only six or seven would eventually be funded due to the limited funds available to HUD.

8. Fitzhugh testified that had a formal proposal been submitted for subsidized housing on the 36 acres and had it somehow managed to avoid a rating of "poor" on the Project Selection Criteria, it would have been competing against proposals for subsidized housing in areas such as Kentfield and Tiburon. Both of those areas are more desirable than Marin City since both of them are predominantly white and neither have large numbers of low income housing units.

would bring in more minority families to an area which could only be characterized as racially impacted. Based on the foregoing testimony, the court concludes that while Fitzhugh may not have given explicit consideration to a proposal for a mixed development on the 36 acres, the concept of such a proposal was implicitly considered both when Fitzhugh concluded that a proposal for subsidized housing would receive a rating of "poor" on criteria two and three and when he concluded that any proposal for subsidized housing would be unable to compete with proposals which would open the rest of Marin County to minority and low income families.

Plaintiffs also contend that Fitzhugh erroneously refused to take into account the topography of the 36 acres in deciding that no further subsidized housing should be built in Marin City. They argue that the elevation of the 36 acres separates them from the rest of Marin City and that therefore, not only would the housing to be built on the 36 acres be separate and distinct from the rest of Marin City, hence permitting the inclusion of subsidized housing, but also that the failure to include such housing will create two communities: a community of well-to-do whites living on the hills surrounding Marin City and a community of poor blacks living in the bowl created by those hills.

The evidence introduced at trial indicates that Fitzhugh was aware of the elevation of the 36 acres but concluded that it did not serve to separate that parcel of land from the rest of Marin City. Thus plaintiffs' real quarrel is with the substance of Fitzhugh's decision. However, even one of plaintiffs' own witnesses testified that the 36 acres, *as they now stand*, are part of the Marin City community. Testimony of Warren Alexander. The court's own visit to the site confirms this view. While the 36 acres lie somewhat above the existing housing in Marin City, much of the housing in Marin City is built on hillsides and housing on the 36 acres could very easily be considered to be a continuation of the existing community. Fitzhugh's decision is therefore not so

irrational that it cannot be allowed to stand.

Finally, plaintiffs contend that in making his decision Fitzhugh refused to consider the views of the community or to await publication of the Marin City Master Plan. Neither of these contentions has merit. Fitzhugh testified that while many residents of Marin City favored the inclusion of subsidized housing on the 36 acres, there were other members of the community, particularly members of the Homeowners Association, who opposed it, feeling that it was essential to bring in a development which could provide a tax base for the community. Thus, there was no consensus and Fitzhugh concluded that the views of the community balanced each other out.

Even more important than the fact that there was no consensus concerning the desirability of building subsidized housing on the 36 acres is the fact even if the community were unanimous in its support for the inclusion of subsidized housing, if the inclusion of such housing would increase or maintain the racial concentration of Marin City (as Fitzhugh concluded that it would), then it was simply impermissible to include such housing. "The affirmative duty to consider the impact of publicly assisted housing programs on racial concentration and to act affirmatively to promote the policy of fair, integrated housing is not to be put aside whenever racial minorities are willing to accept segregated housing." *Otero v. New York City Housing Authority, supra*, 484 F.2d at 1134.

Nor did Fitzhugh err in refusing to await the adoption of the Marin City Master Plan before deciding whether additional subsidized housing should be built on the 36 acres. In the spring of 1971 when Fitzhugh had the MUDA proposal before him, he knew that the Marin City Master Plan was being formulated. However, he also knew that those working on the Master Plan were encountering many difficulties and that it was impossible to predict when the Plan would finally be available. In fact, the Master Plan was not approved until 1973. Thus, while plaintiffs might be justi-

fied in arguing that Fitzhugh should have delayed his decision had he known that the Master Plan would be available within a few months, Fitzhugh might very well have been derelict in his duty had he delayed his decision pending approval of the Master Plan on some distant and unknown date. Fitzhugh had to work with the material available to him at the time he made his decision.

In conclusion, the court finds that plaintiffs have failed to carry their burden in demonstrating the inadequacy of the procedures utilized in reaching the decision of June 7, 1971. Nor have they demonstrated that the decision reached was so irrational that it offends against the principles of the Administrative Procedure Act. Defendants are therefore entitled to judgment on plaintiffs' fourth cause of action.

Nor have plaintiffs met their burden in connection with their fifth cause of action. That cause of action is premised on the theory that in deciding to exclude subsidized housing from the 36 acres, defendants failed to assess the racial impact of their decision on the subsequent development of the 36 acres.

Plaintiffs' argument rests on Fitzhugh's admission that he did not consider the price range of housing to be built on the 36 acres when he decided to exclude subsidized housing from that area. Because blacks are proportionately less able to afford high-priced housing, plaintiffs argue that Fitzhugh's failure to consider the impact which price might have on the racial composition of the 36 acres constituted a violation of his duties under the Fifth Amendment and under the 1964 and 1968 Civil Rights Acts to act affirmatively to assure fair housing.

Fitzhugh's testimony negates this charge. He noted that at the time he made his 1971 decision, it was impossible to know the price range of the housing to be built on the 36 acres because the development rights had not yet been sold. However, he also testified that he knew that any housing to be built there would be less expensive than housing in the rest of Marin County because the price of the land was lower than in other parts of Marin. Further, he knew that when the land was sold there would be certain anti-discrimination covenants included in the deed which would run with the land. Finally, he knew that the Redevelopment Agency would impose on the developer the duty of submitting an affirmative marketing plan designed to encourage the creation of an integrated housing development. Thus as Fitzhugh stated, he had no reason to believe that the 36 acres would not be integrated. Nor have plaintiffs introduced any evidence indicating that the 36 acres will not be integrated and thus indicating that Fitzhugh breached his duty to act affirmatively to assure fair housing.

The testimony of the plaintiffs, themselves, indicates that their real objection to the exclusion of subsidized housing on the 36 acres is not premised on a belief that blacks would be excluded from that area. Their main objection is that *low income* blacks will be excluded from the 36 acres. Thus Nesbitt Crutchfield testified that an integrated development would nevertheless be unsatisfactory so long as it contained only market rate housing. In light of Fitzhugh's testimony indicating that there has been no breach of the duty to act affirmatively to ensure fair housing and in light of plaintiffs' own evidence which indicates that economic considerations lie at the heart of their complaint, the court concludes that defendants are entitled to judgment on plaintiffs' fifth cause of action.

*Conclusion*

From the evidence and findings above stated, the court concludes:

(1) That plaintiffs have not demonstrated that the procedures utilized by defendants in deciding to exclude further subsidized housing from Marin City were an inadequate means of marshalling the appropriate legislative facts or that defendants failed to consider all of the relevant facts thereby making their decision irrational;

(2) That plaintiffs have failed to demonstrate that defendants breached their duty to act affirmatively to achieve fair housing;

(3) That plaintiffs are not entitled to relief;

(4) That defendants are entitled to judgment dismissing the action; and

(5) That each party should bear its own costs of suit.

The foregoing shall constitute the court's findings of fact and conclusions of law in accordance with Rule 52, Federal Rules of Civil Procedure. Defendants are directed to submit an appropriate form of judgment.