153 N.J. Super. 274 (1977)
379 A.2d 497
SHIRLEY ROWE, MARVIN TAYLOR, P.J. GRANT AND BARBARA GRANT, PLAINTIFFS,
v.
PITTSGROVE TOWNSHIP, A MUNICIPAL CORPORATION OF NEW JERSEY; JACOB HELIG, INDIVIDUALLY AND IN HIS CAPACITY AS MAYOR OF PITTSGROVE TOWNSHIP; GEORGE KERSHAK, INDIVIDUALLY AND IN HIS CAPACITY AS THE HOUSING INSPECTOR OF PITTSGROVE TOWNSHIP, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided September 1, 1977.
*278 Mr. Michael S. Berger (American Civil Liberties Union); Ms. Linda R. Hurd (Camden Regional Legal Services, Inc.); Mr. Peter J. O'Connor (Messrs. O'Connor & Roose, attorneys), for plaintiffs.
Mr. George S. Friedman for defendants.
Mr. Allan H. Harbert for amicus curiae City of Bridgeton.
Mr. Carl S. Bisgaier, Deputy Director, for amicus curiae Division of Public Interest Advocacy, Department of the Public Advocate, and amicus curiae for City of Bridgeton and City of Camden.
*279 GRUCCIO, J.S.C.
This matter involves an important issue, not yet determined in this State, namely, whether a municipality which displaces residents of its community by the affirmative act of building code enforcement is under a duty to assist those persons through relocation within the municipality. The question takes on special importance in the context of the present case, as plaintiffs who have been displaced are low income families. Therefore the court, in its considerations, must examine the effects of Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151 (1975) and subsequent decisions interpreting the Mt. Laurel holding. Due to the public interest nature of this matter, the Public Advocate has been granted leave to file a memorandum of law amicus curiae. The City of Bridgeton has also been granted leave to appear amicus curiae since some of plaintiffs have been relocated in low-income housing in Bridgeton.
Plaintiffs in this action are all low-income persons who resided in buildings located on the property of one Albert Robinson on Alvine Road in Pittsgrove Township. The evidence clearly indicates that the buildings being used by plaintiffs as housing are unfit for human habitation. The buildings, which were at one time used as housing for migrant workers, are not equipped with running water and have no toilet facilities. Plaintiffs have been forced to use a hand pump and two unsafe outdoor "privies" as toilet facilities. The dwellings are heated only by a space heater which is located dangerously close to the thin flammable wooden walls.
Following a house code inspection of the premises defendant Kershak, in his capacity as Building Inspector of Pittsgrove Township, scheduled a hearing in January 1974 concerning the condition of the property. As a result of that hearing the buildings occupied by plaintiffs were declared to be unfit for human habitation and ordered to be repaired and used only for storage purposes. Since this order *280 required plaintiffs to vacate the premises, they requested relocation assistance from defendant Pittsgrove Township.
Due to Pittsgrove's failure to act in response to this request, plaintiffs requested a hearing by the Department of Community Affairs. As a result of this hearing the examiner declared plaintiffs to be "displaced persons" and ordered Pittsgrove to assist plaintiffs in locating safe and sanitary housing, pay relocation assistance benefits to plaintiffs and apply for funding under the authority of N.J.S.A. 20: 4-14. When Pittsgrove failed to comply with the order of the Commissioner, effective August 5, 1974, plaintiffs instituted this action in lieu of prerogative writ to compel defendants to comply with that order.
This court, on January 20, 1976, after a full review of the relevant facts and law, determined that Pittsgrove had an affirmative duty to assist plaintiffs in their relocation under the provisions of the New Jersey Relocation Assistance Acts, N.J.S.A. 52:31B-1 et seq. and N.J.S.A. 20:4-1 et seq., together with regulations promulgated thereunder. Accordingly, I heretofore ordered defendants to comply with and implement the Commissioner's order. Pittsgrove made an effort to find housing within its borders but same was nonexistent. Pittsgrove, therefore, found available rental units in Burlington Manor Apartments and sought to have this court require plaintiffs to accept the Burlington Manor Apartments or forfeit their rights to relocation assistance. Plaintiffs refused to move into the Burlington complex on the grounds that it does not qualify as satisfactory permanent relocation housing due to its racially impacted nature[1] and its location outside Pittsgrove Township. Plaintiffs Rowe *281 and Taylor thereafter agreed to accept the Burlington Manor unit as a temporary relocation only since their residence on Alvine Road was destroyed by fire. They continue to allege that Pittsgrove's duty under Mt. Laurel and the relocation statutes is to find permanent relocation housing for them within the township. Bridgeton and the Public Advocate support plaintiffs' position.
The issue presently before the court is whether, under the Mt. Laurel decision, Pittsgrove has the responsibility to relocate plaintiffs within the township. Also at issue is the question whether relocation housing which on its face perpetuates a pattern of racial segregation in both housing and schools can qualify as satisfactory replacement housing under the provisions of the Relocation Laws of 1967 and 1971, N.J.S.A. 52:31B-1 et seq. and N.J.S.A. 20:4-1 et seq.
I have already ruled in this matter that every community is obliged by N.J.S.A. 52:31B-5 to have a Workable Relocation Advisory Program (WRAP). Accordingly, when the Commissioner of the Department of Community Affairs determined that plaintiffs herein were displaced persons within the scope of the act, the statutory obligation arose for Pittsgrove to assist plaintiffs in their relocation efforts. To determine whether the replacement housing located by Pittsgrove fulfills that obligation, an examination of the statutes and the case law is necessary.
In the Mt. Laurel decision, our Supreme Court enunciated the obligation of developing municipalities to affirmatively afford persons of low and moderate income an opportunity to obtain housing in the community, at least to the extent of the municipality's fair share of the region's need for such low and moderate-income housing. 67 N.J. at 174. This obligation arises from the basic state constitutional requirements of Art. I, par. 1 of our Constitution which is more demanding than the Federal Constitution. Robinson v. Cahill, 62 N.J. 473 (1973). Art. I, par. 1 reads:
All persons are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying *282 and defending life and liberty, of acquiring, possessing, and protecting property, and obtaining safety and happiness.
Accordingly, any exercise of police power, at any level of government, must be measured by these state constitutional requirements[2]. Mt. Laurel 67 N.J. at 174.
The holding of Mt. Laurel involved that municipality's zoning laws. Nevertheless, the principle established in that decision regarding the duty to provide and plan for future needs of the region's low and moderate-income families is a principle which should not be narrowly construed. It is equally applicable in other exercises of police power, such as the building code enforcement in the present case. The court held in Weymouth Tp. Taxpayers Ass'n v. Weymouth Tp., 71 N.J. 249 (1976), that the right to decent housing has a preferred status under the State Constitution, and any governmental action which significantly impinges upon the ability of some class of individuals to obtain this necessity of life deserves close judicial scrutiny. 71 N.J. at 287.
Recent cases dealing with the application of Mt. Laurel principles have made it clear that the dictates of that decision are applicable only to developing communities. See e.g. Nigito v. Closter, 142 N.J. Super. 1 (App. Div. 1976); Segal Constr. Co. v. Wenonah Zoning Bd. of Adj., 134 N.J. Super. 421 (App. Div. 1975), and Windmill Estates v. Totowa Zoning Bd. of Adj., 147 N.J. Super. 65 (Law Div. 1976).[3] To determine whether Pittsgrove Township is a developing community which must include a fair share of the region's *283 housing needs in its plans for present and future growth, a review of the character of the township is required.[4]
Pittsgrove Township, located in Salem County, encompasses 46.5 square miles. The population in 1975 was 4,935, reflecting a 6.8% growth rate since 1970 as opposed to a 5.6% for the county as a whole over the same period. In the period from 1950 to 1960 Pittsgrove's growth rate was 34.7% as opposed to 18.5% for the county, and from 1960 to 1970 22% as opposed to 2.8% for the county. The township is projected to have an increasing growth rate and become a significant population center for the county by the year 2000.
The anticipated growth of the township is attributable in large part to its location and proximity to county roads. The township is located eight miles from Vineland, a significant population center for the region with a population of 50,925, and it is located 9.5 miles from Bridgeton, another significant population center with 21,540 residents. Both these cities have industrial development which has the potential for expansion in Pittsgrove, and in fact industrial development already located there is attributed to the growth of the adjacent Vineland area. The growth potential of the township will be significantly affected by the completion of State Route 55 to the north which will furnish the region with expressway access to the Camden-Philadelphia urban area approximately 25 to 30 miles away.
A review of the present land use in Pittsgrove indicates that 91.6% of the total acreage in the township is currently undeveloped. This includes 82.5% currently zoned agricultural-rural residential, of which only 7% is developed. It is clear from the data supplied to the court that Pittsgrove is not only a developing community within the scope of Mt. *284 Laurel but also will experience rapid growth in the near future.
Plaintiffs here are within one of the classes of persons which the court in Mt. Laurel found to clearly have standing to challenge the exclusionary zoning, for plaintiffs Rowe and Taylor are former residents who were forced to move elsewhere because of the absence of suitable housing. Plaintiffs Grant are present residents residing in dilapidated, substandard housing. See 67 N.J. at 159, n. 3. It is not an uncommon occurrence for low-income famiiles to find themselves in such a situation. No community remains static. Buildings become old, rundown and eventually uninhabitable. Municipalities cannot close their eyes to this, nor can they abdicate their obligation to prepare for such an occurrence. See Windmill Estates v. Totowa Zoning Bd. of Adj., 147 N.J. Super. 65 (Law Div. 1976).
Where the Supreme Court has determined that a developing community must, under our Constitution, plan for and prepare to accept its fair share of the region's low and moderate-income housing, it is clear to me that such a community cannot constitutionally remove low income residents by the affirmative act of building code enforcement. The Relocation Assistance Acts of 1967 and 1971 impose further statutory obligations upon a municipality which displaces persons regardless of income. The policy section of N.J.S.A. 20:4-2 declares the purpose of the act to be the establishment of a fair and equitable treatment of displaced persons. Certainly the performance by Pittsgrove of its statutory obligation to assist with relocation under N.J.S.A. 20:4-7 cannot be accomplished by a method which fails to comport with the equal protection requirements of the Constitution. See Oakwood at Madison v. Madison Tp., 72 N.J. 481, 496 (1977), where the Supreme Court stated that if the Municipal Land Use Act N.J.S.A. 40:55D-1 et seq. conflicted with the constitutional principles of Mt. Laurel the statute must yield.
*285 I find that Pittsgrove Township is a "developing" community within the meaning of that term in the Mt. Laurel decision. I further find that Pittsgrove's obligation under N.J.S.A. 20:4-7 to establish a Workable Relocation Assistance Program must be met in a manner which fulfills the affirmative responsibilities imposed upon that community by Mt. Laurel. Pittsgrove may not circumvent its obligation to house a fair share of the region's low-income families by relocating displaced, low income families in Bridgeton.
Pittsgrove's duty to plan for the deterioration of residences within the community must be met by adequate provision for replacement housing. In Oakwood at Madison v. Madison Tp., supra, the Supreme Court held that while municipalities do not have the duty to build or subsidize housing,[5] it is a well-known fact that private enterprise will not construct new housing affordable by the low-income population without subsidization or external incentive. The court in Oakwood stated, "It is desirable that administrative agencies acting under legislative authorization assume the regulation of the housing distribution problem." 72 N.J. at 500. The court also iterated its view expressed in Mt. Laurel that provision for appropriate allocation of suitable housing for all categories of the population of a region is more appropriately a legislative and administrative than a judicial function. 72 N.J. at 534.
In the present case, the Legislature has authorized the Department of Community Affairs to take an active role in the process of relocating displaced persons. The entire legislative scheme of the Relocation Assistance Acts of 1967 and 1971 includes administrative involvement in relocation efforts under the statutes. See, e.g., N.J.S.A. 20:4-13. The Commissioner of Community Affairs has ordered Pittsgrove to apply for an "umbrella" grant for code enforcement relocatees. To this extent administrative action has been taken *286 in the spirit of the Mt. Laurel recommendation. Additionally, under the regulations promulgated by the Commissioner, the Workable Relocation Assistance Program which Pittsgrove is required to provide must include replacement housing on a one to one basis since the vacancy rate there is less than three percent by unit size and cost level. N.J. Administrative Code § 5:11-4.3(a) (1972). Finally, the provisions of the Local Housing Authorities Law, N.J.S.A. 55:14A-1 et seq., allows municipalities such as Pittsgrove to organize local housing authorities with broad powers to accept federal regulations and seek financial aid for the construction of public housing. N.J.S.A. 55:14A-2 indicates legislative recognition of the need to clear, replan and reconstruct unsanitary and unsafe housing conditions in order to provide safe and sanitary accommodations for persons of low income.
It is legislative and administrative authority such as these which can undertake the planning task outlined in Oakwood and Mt. Laurel at least insofar as relocation of low-income families is concerned. It is clear to this court that when a displacement of persons occurs by reason of the code enforcement actions of a developing community, the considerations of Mt. Laurel may be read in conjunction with the provisions of the Relocation Assistance Acts of 1967 and 1971, regulations promulgated thereunder and the Local Housing Authorities Act of 1938 to impose upon the displacing authority an affirmative duty to plan for and provide suitable replacement housing within the municipality.
Pittsgrove's duty to locate suitable replacement housing must also be measured by the racial and ethnic composition of the replacement housing and the effect the proposed relocation will have upon existing housing patterns. Title VIII of the Civil Rights Act of 1968 and the New Jersey Administrative Code § 5.11-2.3(b) (ii) (4) (1972). A recent line of federal decision has made it clear that in the development of public housing for low income families federal, state and local housing authorities are under an affirmative duty to promote and achieve integration in housing. *287 See Otero v. N.Y. City Housing Auth., 484 F.2d 1122 (2d Cir.1973); Shannon v. H.U.D., 436 F.2d 809 (3d Cir.1970); Gautreaux v. Chicago Housing Auth., 296 F. Supp. 907, 304 F. Supp. 736 (judgm. order) (N.D. Ill. 1969), aff'd 436 F.2d 306 (7 Cir.1970), cert. den. 402 U.S. 922, 91 S.Ct. 1378, 28 L.Ed.2d 661 (1971). Where a dominant factor in selecting a site for a housing project is the racial concentration of the neighborhood, and the site is selected with the purpose of perpetuating racial segregation, such action by the authority violates the equal protection provisions of the Fourteenth Amendment as well as the Civil Rights Act of 1964. 42 U.S.C.A. § 2000d; Hicks v. Weaver, 302 F. Supp. 619 (E.D. La. 1969).
Color blindness has no place in the present case where affirmative action by Pittsgrove, i.e. code enforcement, has brought into play constitutional considerations of equal protection as well as the national policy of fair housing and integration in housing found in Title VIII of the Civil Rights Act of 1968. Resident Advisory Bd. v. Rizzo, 425 F. Supp. 987 (E.D. Pa. 1976). The figures supplied to the court regarding the racial and ethnic composition of the public housing projects in Bridgeton which Pittsgrove wishes to use as permanent replacement housing demonstrate that those public housing projects are occupied almost exclusively by minority black and Spanish-American families. Plaintiffs here are all black. This court cannot allow Pittsgrove to ignore the racial composition of the proposed replacement facilities and the segregating effect of permitting Pittsgrove to use Burlington Manor Apartments as a relocation resource for its displacees.
Permanent relocation in Bridgeton, if part of a planned program of population loss of minority residents, violates the constitutional rights of those residents. Garrett v. Hamtramck, 503 F.2d 1236 (6 Cir.1974). Discriminatory exclusions of a minority by physical displacement is no less objectionable than exclusion by zoning. Arrington v. Fairfield City, 414 F.2d 687, 692 (5 Cir.1969). The evidence *288 is insufficient to find a discriminatory animus in the actions of Pittsgrove Township that has presently violated plaintiffs' constitutional rights. However, the requirements of the Fourteenth Amendment and Title VIII of the Civil Rights Act of 1968 impose upon Pittsgrove the affirmative duty to relocate its residents in a manner which will not perpetuate segregated housing patterns but rather promote a policy of fair, integrated housing. Otero v. N.Y. City Housing Auth., supra; Marin City Council v. Marin Cty. Redevelop. Agency, 416 F. Supp. 707 (N.D. Cal. 1976).
It is the order of this court that Pittsgrove Township immediately take the necessary steps in order to provide appropriate permanent replacement housing for plaintiffs within Pittsgrove Township. The present emergency housing occupied by plaintiffs Rowe and Taylor is found to be satisfactory as a temporary relocation only. Pittsgrove Township is further ordered to comply with the order of this court with all due haste, as the unsafe housing presently occupied by plaintiffs Taylor will not long be tolerated by this court. Any difficulties Pittsgrove Township may encounter are engendered only by its own past failure to act in the best interest of its low-income residents. Pittsgrove cannot say to its neighboring municipalities who have low-income housing, take our displaced, our weary, poor and unfortunate; we have no room for them and no plan for the future to house them. Once persons are displaced by municipal action declaring their housing unfit for human habitation, the municipality cannot stop there. Under the statutory and decisional law, it has an affirmative duty to provide its fair share of housing for its citizens within the municipality.

APPENDIX

Profile of Pittsgrove Township

Size
Pittsgrove Township encompasses 29,760 acres of 46.5 square miles.

*289 Bordering Communities

Pittsgrove Township is bordered by Upper Pittsgrove Township and Elmer Borough in Salem County to the north and west, Franklin Township in Gloucester County to the north, Vineland City in Cumberland County to the east, and Deerfield and Upper Deerfield Townships, also in Cumberland County, to the south.

Distance to regional communities
The distances to regional cities has been determined from the City Hall in Olivet:

 Population
 9.5 miles to Bridgeton 21,540
 8 miles to Vineland 50,925
 16.5 miles to Salem City 7,970
 11.5 miles to Woodstown 3,260
 10.5 miles to Glassboro 13,800
 25 miles to Wilmington
 29 miles to Philadelphia
 12 miles to Millville 22,695

 Pittsgrove Township Salem County
Year Population Growth Rate Population Growth Rate
1950 2,808 30.2% 49,508 17.1%
1960 3,785 34.7% 58,711 18.5%
1970 4,618 22.0% 60,346 2.8%
1975 4,935 6.8% 63,730 5.6%

Population Projections (shown on attached sheets)
Construction Activity  Building Permits[*]

 1971  32 1974  43
 1972  50 1975  55
 1973  62 1976  71

Transportation
The only major highway improvement which will affect Pittsgrove Township is the completion of Route 55 to the north. The highway is constructed between Vineland and Millville but will be completed to the Camden area over an *290 extended period of time. The expressway runs near the township's eastern border.

Pittsgrove
A 22% population increase occurred in Pittsgrove from 1960 to 1970. Building permits and subdivision activity at the halfway point of this decade indicate a continuing rapid rate of growth in the township. The township is projected to have an increasing rate of growth because of its location, the amount of county roads, and its environment. Pittsgrove will become a significant population center for the county by the year 2000 with a projected population of 8,100.

 1975  4,935
 1980  5,520
 1985  6,040
 1990  6,420
 1995  7,120
 2000  8,100
 2010  9,700

A low of 6,600 and a high of 8,800 for the year 2000 are the range based on different growth patterns.

*291
 LAND USE[*]Density
 Table 1  1975 Density Estimate  1975
 Persons Persons per Persons per
 per Acre Developed Acre Residential Acres
Alloway .12 1.28 4.60
Elmer 2.88 5.62 9.65
Elsinboro .14 1.98 4.94
Lower Alloways Creek .05 .85 3.66
Mannington .08 1.41 4.72
Oldmans .17 .71 6.79
Penns Grove 10.88 12.83 24.38
Pennsville .92 4.48 10.19
Pilesgrove .12 1.37 3.23
Pittsgrove .17 1.96 3.89
Quinton .17 2.21 4.82
Salem City 4.57 10.89 27.89
Upper Penns Neck .66 3.09 9.04
Upper Pittsgrove .12 1.41 4.00
Woodstown 3.11 5.95 11.27
Salem County .29 2.62 7.41

*292
 LAND USE[*]
 Existing Land Use
 Table 2  Acreage in Use, Municipal  1975 Cont'd 
 -----------------
 | Pittsgrove | Quinton Salem City
 | |
 | % of | % of % of
 | Acres Total | Acres Total Acres Total
 | |
Residential | 1,270.3 4.3 | 554.6 3.4 285.8 16.4
Commercial | 92.2 .3 | 31.5 .2 61.0 3.5
Wholesale, Industry | 98.1 .3 | 19.5 .1 64.7 3.7
Community Service | 161.5 .5 | 54.2 .3 136.9 7.9
Transportation | 645.8 2.2 | 264.6 1.6 155.0 8.9
Utility | 248.4 .8 | 285.3 1.8 28.2 1.6
 | |
Total Developed Land | 2,516.3 8.4 | 1,209.7 7.4 731.6 42.0
 | |
 | |
Agriculture | 9,519.5 32.0 | 7,073.9 43.7 210.7 12.1
Open Land | 524.9 1.8 | 240.1 1.5 40.8 2.3
Marginal | 91.2 .3 | 21.0 .1 224.3 12.9
Water | 533.7 1.8 | 236.9 1.5 86.8 5.0
Usable Vacant | 1,795.4 6.0 | 143.5 .9 436.3 25.0
Woodland | 14,779.0 49.7 | 7,266.8 44.9 12.7 .7
 | |
Total Undeveloped Land | 27,243.7 91.6 | 14,982.2 92.6 1,011.6 58.0
 | |
Total Land | 29,760.0 100.0 | 16,191.9 100.0 1,743.2 100.0
 -----------------

Pittsgrove Township Zoning
R-100  About 7% of the total township area is zoned R-100.

*293 R-150  About 10% of the total township area is zoned R150.
Business  About .5% of the total township area is zoned for retail and business.
R-300  The remaining 82.5% of the township area is zoned R-300.
Business Zones
1. The business zone in Willow Grove is less than 5% developed.
2. The business zone in Olivet is less than 3% developed.
3. The business zone at Centerton is almost totally developed.
4. The business zone at Brotmanville is almost totally developed.
5. The business zone at Norma is about 40% developed.
R-100 Zones
1. The R-100 zone around Willow Grove is less than 15% developed.
2. The R-100 zone around Olivet is less than 10% developed.
3. The R-100 zone at Brotmanville is about 40% developed.
4. The R-100 zone at Norma is about 30% developed.
R-150 Zones
1. The R-150 zone at Willow Grove is less than 10% developed.
2. The R-150 zone at Olivet is about 15% developed.
3. The R-150 zone at Brotmanville/Norma is 10% developed.
R-300 Zones
The R-300 zones are about 7% developed.
*294 Zoning designations:
1. R-300  Agricultural-rural residential
2. R-150  Low Density Residential
3. R-100  High Density Residential
4. Retail Business Zones.
NOTES
[1] The affidavit of Bridgeton City Solicitor Allan Harbert, dated February 18, 1977, produced at the request of the court and with consent of counsel, shows that the occupancy of Burlington Manor is nonminority and black. Other public housing projects in the area also have high minority occupancy rates. Bridgeton Villas I and II are shown as having 116 minority-black occupants and 12 minority-Spanish occupants with only 20 nonminority (white) occupants.
[2] Since the Mt. Laurel decision is based on state constitutional notions of equal protection, its holdings are uneffected by the less restrictive federal requirements enunciated in Arlington Heights v. Metropolitan Housing Development Corp., 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).
[3] The Supreme Court has decided Pascack Association, Limited v. Mayor and Council of Washington Tp. et seq., 74 N.J. 470 (1977) which in essence reaffirms Mt. Laurel and Oakwood, and apparently exempts some fully developed municipalities, particularly small ones.
[4] The court takes judicial notice of statistics contained herein, which are complied, published and maintained by the Salem County Planning Board. The same are appended to this opinion and made a part hereof.
[5] 72 N.J. at p. 499 (1977).
[*] Permits are entirely-single family except for four in 1972.
[*] Prepared by Salem County Planning Board, November 1976.
[*] Prepared by Salem County Planning Board, November 1976.